**WARNER–JENKINSON COMPANY, and H. Kohnstamm & Company, Inc., Plaintiffs-Appellants,**

**v.**

**ALLIED CHEMICAL CORPORATION, Defendant-Appellee.**

**No. 503, Docket 76–7435.**

United States Court of Appeals, Second Circuit.

Argued Feb. 16, 1977.

Decided April 13, 1977.

Francis T. Carr, New York City (Kenyon & Kenyon Reilly, Carr & Chapin, Paul Lempel, Edwin Baranowski, Philip J. McCabe, Stephen B. Shear, New York City, on the brief), for plaintiffs-appellants Warner-Jenkinson Co. and H. Kohnstamm & Co., Inc.

Patrick J. Joyce, New York City, on the brief, for H. Kohnstamm & Co., Inc.

Donald G. Leavitt, Koening, Senniger, Power & Leavitt, St. Louis, Mo., on the brief, for Warner-Jenkinson Co.

William J. Gilbreth, New York City (Fish & Neave, William K. Kerr, John E. Nathan and Hugh C. Barrett, New York City, and Roy H. Massengill and Jay P. Friedenson, Morristown, N. J., on the brief), for defendant-appellee.

Before LUMBARD, ANDERSON and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

Warner-Jenkinson Company and H. Kohnstamm & Company, Inc. appeal from an August 13, 1976 judgment by Judge Frankel of the Southern District, who dismissed their action for invalidation of patents owned by Allied Chemical Corporation and ordered the payment to Allied of royalties which had been withheld pendente lite. Judge Frankel held that the appellants, who entered into a licensing agreement with the defendant as part of a settlement of earlier litigation, were thereby barred during the period when the agreement was not terminable by the licensees from seeking declaratory relief from royalty obligations on the basis of patent invalidity. We conclude that a nonterminable licensing agreement does not estop licensees from litigating validity and we reverse the judgment of the district court and remand for further proceedings.

All three parties are manufacturers of food coloring. Allied owns patents Nos. 3,519,617 and 3,640,733 issued in 1970 and 1972 for the chemical composition and production of a red food color known as Food, Drug & Cosmetics Red No. 40. Warner-Jenkinson and Kohnstamm are licensees of Allied who seek to challenge the validity of these patents.[1]

Until recently, another dye, Red No. 2, was the predominant red color additive in the food industry, and Red No. 40 was not widely used. However, in October 1971 the Food and Drug Administration announced it was considering the imminent delisting Red No. 2 for public health reasons. Since red is the dye most used in food coloring, and since Allied held a patent on Red No. 40, which is the only practicable alternative to Red No. 2, Warner-Jenkinson and Kohnstamm each sought manufacturing licenses from Allied. Allied refused.

Thereupon appellants proceeded to manufacture Red No. 40 in defiance of Allied's patent and in early 1972 instituted suit in the Southern District seeking a declaration of patent invalidity and damages for alleged unfair competition. Allied counterclaimed for infringement. After extensive discovery and pretrial briefing, trial was scheduled to commence before Judge William C. Conner on March 10, 1975. At this point FDA had still not delisted Red No. 2.

At the outset of trial, however, Judge Conner suggested that the parties try to settle the case. Judge Conner then con-

---

1. Warner-Jenkinson is a Missouri corporation; Kohnstamm and Allied are New York corporations.

ducted a series of settlement conferences over the next two days, at the end of which the parties agreed in principle to settle on the basis of a $200,000 payment for past infringement and a royalty of 17½% of net sales for future manufacture, use, and sale of Red No. 40.

Details of the settlement were negotiated over the ensuing four months. At first, Allied asked for a consent judgment of patent validity, but this the plaintiffs rejected. The bargain ultimately struck by the parties included the following: (1) a "Stipulation and Order," endorsed by Judge Conner on July 23, 1975, dismissing plaintiffs' patent invalidity claims without prejudice, dismissing their unfair competition claims with prejudice, and dismissing defendant's infringement claim without prejudice; and (2) a "Settlement Agreement" under which plaintiffs agreed to pay defendant $200,000 in exchange for releases from liability for any past infringement, plaintiffs agreed to release defendant from liability for any past unfair competition, and both sides agreed to enter into (3) "License Agreements" providing for 17½% royalties payable quarterly to the licensor Allied, allowing the licensor to terminate on 60 days notice in the event of non-payment of royalties by the licensee, and allowing the licensee to terminate on 60 days notice at any time after March 1, 1977. The settlement and license agreements were made effective as of March 1, 1975. It is not clear from the record whether Judge Conner had the agreements before him at the time he signed the stipulation and order, but it is clear that he was aware of their existence.

Royalty payments totalling approximately $500,000 were made by appellants over the first year of the agreement. However, on February 12, 1976 the FDA finally de-

listed Red No. 2. Since much heavier use of Red No. 40 therefore became necessary, appellants asked Allied to lower its 17½% royalty rate. Allied declined to be so generous.[2] Kohnstamm again brought suit in the Southern District to set aside Allied's patent. They also sought a show cause order allowing them to deposit their royalty payments in escrow pendente lite, beginning with the quarterly payment due June 30.[3] After briefing and argument, Judge Frankel dismissed plaintiffs' complaint and ordered them to pay the June 30 royalties with interest. He granted plaintiffs' request for leave to file a supersedeas bond for the June 30 royalties pending this appeal.

We first address the question of subject matter jurisdiction, which, although briefed in the district court, was not argued by the parties on appeal. The Declaratory Judgment Act, 28 U.S.C. § 2201, does not independently create federal jurisdiction. According to *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), an action for declaratory judgment may be brought in federal court ordinarily only if there would exist a basis for federal jurisdiction in a coercive action between the two parties. See also *Public Service Commission v. Wycoff Co.,* 344 U.S. 237, 248, 73 S.Ct. 236, 97 L.Ed. 291 (1952). If the plaintiffs were seeking a declaration simply of their right to assert patent invalidity as a defense to a contract action for royalties, which itself could not be brought in federal court, see e. g., *Luckett v. Delpark,* 270 U.S. 496, 502, 510, 46 S.Ct. 397, 70 L.Ed. 703 (1926); *Arvin Industries, Inc. v. Berns Air King Corp.,* 7 Cir., 510 F.2d 1070 (1975); see generally *Louisville & Nashville R. R. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), one might conclude that no "arising-under"

2. Besides the parties to this case, there are approximately three other major manufacturers of food color in the United States. On March 15, 1976 one of these, the Hilton-Davis Chemical Company, obtained a license for Red No. 40 from Allied with a 17½% royalty rate under an agreement nonterminable by the licensee for one year.

3. Judge Frankel heard the application on June 25 and adjourned it until August 11 as an accommodation to both parties; until then, he ordered that plaintiffs could withhold their June 30 royalty payments without prejudicing their licenses.

jurisdiction would be present. See *Thiokol Chemical Corp. v. Burlington Indus., Inc.,* 448 F.2d 1328, 1330–31 (3d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). See also *Hanes Corp. v. Millard,* 174 U.S.App.D.C. 253, 531 F.2d 585, 594–95 n. 8 (1976).

However, a second, and perhaps more important, reason why the plaintiffs want a declaration of patent invalidity is for its use as a defense in a patent infringement action. Under their licensing arrangement, nonpayment of royalties constitutes a material breach which gives the patentee the right to terminate the license prospectively. Thus, within a few months after the plaintiffs become liable for payment of royalties under contract law, they will also be subject to an action in federal court for an injunction and damages for infringement, see *Luckett v. Delpark, supra,* 270 U.S. at 510, 46 S.Ct. 397. At the present time the defendant has neither a state contract action nor a federal infringement action since the plaintiffs have not stopped paying royalties. One act on the part of the declaratory plaintiffs, nonpayment of royalties, will leave them vulnerable to federal as well as state claims by the declaratory defendants. Accordingly, plaintiffs' action for declaratory judgment is raising a defense in anticipation of an impending federal action, and federal "arising under" jurisdiction is clearly present under *Skelly Oil* and *Wycoff.*[4]

■ The merits of this appeal are largely governed by *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). There the Supreme Court rejected the principle of "licensee estoppel" and held that a patent licensee may assert patent invalidity as a defense to a contract action for nonpayment of royalties.

> [T]he equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Li-

censees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest.

Id. at 670, 89 S.Ct. at 1911.

■ Addressing the question whether a patent licensee must actually withhold royalty payments before he can challenge validity, we conclude—as have most courts who have considered the issue—that such repudiation of the licensing agreement should not be precondition to suit. Compare *PPG Industries, Inc. v. Westwood Chemical, Inc.,* 530 F.2d 700, 707 (6th Cir. 1976), cert. denied, 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976); *American Sterilizer Co. v. Sybron Corp.,* 526 F.2d 542, 546 (3rd Cir. 1975); *Milton Roy Co. v. Bausch & Lomb, Inc.,* 418 F.Supp. 975, 978–79 (D.Del. 1976); *Dahlgren Manufacturing Co. v. Harris Corp.,* 399 F.Supp. 1253, 1256 (N.D.Tex. 1975), and *Medtronic, Inc. v. American Optical Corp.,* 327 F.Supp. 1327, 1331 (D.Minn. 1971), with *W. R. Grace & Co. v. Union Carbide Corp.,* 319 F.Supp. 307, 311 (S.D.N.Y.1970), and *Thiokol Chemical Corp. v. Burlington Industries Inc.,* 313 F.Supp. 253 (D.Del.1970), aff'd, 448 F.2d 1328 (3rd Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). Under most licensing arrangements, as in the present case, withholding of royalty payments constitutes a material breach of the contract. A licensee who wishes to continue using the patented element cannot withhold royalty payments without laying himself open to large potential liability for infringement and an injunction against all future use of the patented substance. If forced to make the hard choice, many licensees will choose the less perilous course, and the patents under which they are licensed will remain

---

**4.** There is clearly a case and controversy here since the plaintiffs-licensees have an interest in proving patent invalidity and thereby escaping liability for royalties. The danger of collusive suits is no greater in this context than in any patent validity cases.

uncontested. *Lear* established that removing restraints on commerce caused by improperly-held patents should be considered more important than enforcing promises between contracting parties. Thus, the seeming inequity of allowing a licensee to keep his license while he attacks the validity of the licensor's patent is outweighed by the public interest in placing no impediment in the way of those in the best position to contest the validity of the underlying patent.

Moreover, we are not persuaded by appellee's argument that enforcement of a royalties agreement should prevail where that agreement was part of a litigation settlement. There is certainly a public interest in the avoidance of litigation through the peaceful resolution of lawsuits. In the patent field, however, this interest is to be balanced against the public interest in having invalid patents cleared away through litigation. If encouragement of such litigation is important enough to justify allowing licensees to sue to invalidate patents, then it makes little sense for us to strain to preserve the termination of such litigation through a settlement. Of course, if a stipulated dismissal is with prejudice, see, e. g., *Broadview Chemical Corp. v. Loctite Corp.,* 474 F.2d 1391, 1394–95 (2d Cir. 1973), if a settlement agreement contains an explicit prohibition on licensee suits during some future period, or if the payment of royalties is *so ordered* by a court as part of a settlement, see, e. g., *Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 715–17 (2d Cir. 1974), a court may feel that effect should be given to such provisions. However, the *Lear* decision militates against reading such provisions into a settlement agreement. Although one court has suggested that settlement-agreement licensee estoppels might be imposed through an objective, case-by-case balancing of the interests, *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368 (6th Cir. 1976), cert. denied, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976), we

are unwilling to leave parties at the mercy of what inevitably would be an imprecise and uncertain test.

The plaintiffs should not be barred from declaratory relief simply because the licensing agreement is not terminable by the licensee for two years. Such a provision in a patent licensing agreement serves a function analogous to that of a liquidated damages clause; it gives the patentee the option of claiming a fixed sum, royalties, instead of having to litigate regarding an indeterminate amount, damages for infringement. Thus, a two-year moratorium on litigation is not implicit in every two-year nontermination provision.[5]

■ The final issue on this appeal concerns plaintiffs' proposal that they be allowed to pay their royalties into escrow, see *Nebraska Engineering Corp. v. Shivvers,* Civ. No. 76–221–1 (S.D. Iowa Oct. 1, 1976). We believe that if the plaintiffs wish to continue to invoke the protections of their licensing agreements, they should be required to continue paying their royalties to the defendant. Ultimately, all royalties paid after the filing of the complaint may have to be returned to the plaintiffs. Once the plaintiffs have proved patent invalidity, they would become entitled to withhold future royalties and to receive restitution of royalties paid pendente lite (with interest). See, e. g., *Atlas Chemical Industries, Inc. v. Moraine Products,* 509 F.2d 1, 4–7 (6th Cir. 1974). Thus the only question is who should have the use of the money during the interim. At present, plaintiffs already have the option of withholding royalties and thereby breaching the licensing agreement; of course, they would then run the risk of an injunction if they should lose on the merits. It would not be fair for the plaintiffs to be allowed simultaneously to reap all the benefits of the licensing agreement and to deprive the licensor of all his royalties. Patents are presumed to be valid, 35 U.S.C. § 282; until invalidity is prov-

5. In any event, there would be no bar to plaintiffs reinitiating their suit with respect to royalties accruing after March 1, 1977, the end of the two-year nontermination period. As we have indicated above, termination or breach of the licensing agreement would not be a precondition to plaintiffs' suit after that time.

en, the patentee should ordinarily be permitted to enjoy the fruits of his invention. The principal effect of an escrow arrangement would be to put undeserved pressure on the defendant. Therefore, in the absence of any indication that Allied might be judgment-proof at the end of the litigation, we conclude that it should not be deprived of its right to receive royalties in the interim.

Reversed and remanded.

TIMBERS, Circuit Judge, dissenting:

In this concededly close case, I cannot say that the majority's analysis is an unreasonable one. Indeed, I agree with Judge Lumbard's clear, straightforward opinion to the extent that it holds that under *Lear, Inc. v. Adkins,* 395 U.S. 653 (1969), a licensee need not repudiate his licensing agreement as a precondition to challenging the validity of the patent. I also agree with the majority's rejection of appellants' proposal that as licensees they be permitted to pay into escrow royalties that accrue pending adjudication of validity, although under my view of the merits set forth below the escrow question need not be reached.

Turning to the critical issue, the licensing agreement here involved, properly construed, bars appellants from contesting the validity of the patents for a period of two years. To enforce the licensing agreement thus construed as an integral part of the earlier settlement, it seems to me, would not frustrate in any material way the policy of *Lear* of encouraging prompt and effective challenges to the validity of patents. I therefore would hold that the licensing agreement estops appellants from litigating the validity of the patents prior to the expiration of the two year period. It is on this issue that I respectfully dissent from the holding of the majority.

The unmuzzling of licensees provided for in *Lear* stemmed from the Court's determination to accord primacy to the federal policy favoring dedication to the public of useful ideas not protected by a valid patent over the technical requirements of contract law. But the Court explicitly restricted the balance thus struck in the licensee's favor to "the typical situation involving the negotiation of a license after a patent has issued." 395 U.S. at 670–71.

This typical situation strikes me as being significantly altered when the patentee seeks to prevent his licensee from challenging validity, not by merely standing on the contract, but by claiming a res judicata bar based upon an earlier consent decree or an estoppel stemming from a settlement agreement executed in connection with an earlier stipulated dismissal. The patentee with a res judicata defense, for example, introduces into the balance considerations of effective judicial administration and fairness to litigants, to be weighed against *Lear's* policy of providing access to the courts for potential contestants of patent validity. A patentee such as appellee here, which is a party to a licensing agreement entered into in connection with a settlement agreement and stipulated dismissal without prejudice, lacks the requisites for a res judicata defense. See Fed.R.Civ.P. 41. But a valid settlement agreement can bind a party as effectively as a judgment despite the absence of an adjudication. Settlement of course is a favored method of terminating disputes. *Williams v. First National Bank,* 216 U.S. 582, 595 (1910). When properly entered into, a settlement is just as binding, final and conclusive of the parties' rights as a judgment. See, e. g., *Thomas v. State of Louisiana,* 534 F.2d 613 (5 Cir. 1976); *Clinton Street Greater Bethlehem Church v. City of Detroit,* 484 F.2d 185 (6 Cir. 1973). This rule of preclusion rests on the same administrative and equitable considerations as does the res judicata bar.

Decisions subsequent to Lear have indicated a tendency to accord controlling weight to the administrative and equitable policies behind the rule of preclusion without transgressing *Lear's* policy of open access to the courts. Pre-*Lear* case law, see *Addressograph-Multigraph Corp. v. Cooper,* 156 F.2d 483 (2 Cir. 1946), which gave res judicata effect to consent decrees containing findings of infringement, has been reaffirmed. See, e. g., *Broadview Chemical*

*Corp. v. Loctite Corp.,* 474 F.2d 1391, 1394–95 (2 Cir. 1973); *Schlegel Manufacturing Co. v. USM Corp.,* 525 F.2d 775 (6 Cir. 1975), *cert. denied,* 425 U.S. 912 (1976).[1] But cf. *Kraly v. National Distillers and Chemical Corp.,* 502 F.2d 1366, 1369 (7 Cir. 1974) (dicta suggesting that *Lear* would preclude a res judicata bar grounded on a consent decree containing a finding of infringement). See generally, Note, " 'To Bind or Not to Bind': Bar and Merger Treatment of Consent Decrees in Patent Infringement Litigation," 74 Colum.L.Rev. 1322 (1974).

The question whether, under *Lear,* patent settlements should be given any preclusive effect was raised and ruled upon squarely in *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368 (6 Cir. 1976), *cert. denied,* 429 U.S. 862 (1976). There the Sixth Circuit enforced a licensing agreement entered into in connection with a settlement and dismissal without prejudice. Effecting an accommodation of the conflicting policies, the court held that the "public interest in the settlement of this litigation far outweighs any public interest to be served by providing [the licensee] with a second chance to litigate . . . validity . . . ." 531 F.2d at 1374. The amount of royalties involved was minimal; there were other potential challengers; and the patent had only three years to run. The court concluded that enforcement of the settlement agreement would result in no substantial detriment to the public interest. In so holding, the court's reading of *Lear* strikes me as particularly appropriate to the instant case:

"Whatever boon *Lear* may have provided those who take licenses under certain conditions, it cannot be interpreted so broadly as to condone a kind of gamesmanship, wherein the alleged infringer after employing the judicial system for months of discovery, negotiation and sparring, abandons its challenge to validity, executes a license in settlement, and then repudiates the license and seeks to start the fight all over again in the courts. *Lear* does not require that the courts answer every beck and call of the fickle suitor whose transient affection is governed by such on-again, off-again strategies. . . ." 531 F.2d at 1373.[2]

Cf. *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1221 (4 Cir. 1976); *Randsberg Electro-Coating Corp. v. Spiller & Spiller, Inc.,* 489 F.2d 974 (7 Cir. 1973).

*Aro* strikes me as providing a sound accommodation of the competing interests here involved. It recognizes that *Lear's* promotion of the public interest in prompt and effective challenges to patent validity will not be served in all cases by granting a putative infringer absolute liberty to subvert orderly litigation processes to suit his momentary pecuniary interests. On the contrary, *Aro* recognizes that judicial efforts toward avoiding time-consuming and expensive patent litigation will retain their utility only if the licensee to some extent is bound by the contract. I would follow *Aro* and require the holder of a license obtained in an earlier settlement to demonstrate a substantial public need for immediate adjudication at his instance before reopening the courthouse doors.

One factor in the present case impresses me as weighing heavily toward a required demonstration of public need. Appellants are paying substantial royalties which the

---

**1.** In *Addressograph-Multigraph Corp. v. Cooper, supra,* 156 F.2d at 484–85, our Court, for substantially the same reasons of public policy which later proved decisive in *Lear,* held that no res judicata effect would be given to a patent consent decree containing findings of validity but lacking findings of infringement. Even though *Cooper* delimits the preclusive effect of some consent decrees, I would not read it to imply a per se rule that settlement agreements under no circumstances can bar litigation. Although the instant settlement was not the result of any adjudication, much less one of validity only,

appellee seeks enforcement of only a two year term and does not ask that it be given the permanent preclusive effect of a judgment.

**2.** There has been similar gamesmanship in the instant case. All concerned exerted a great deal of effort prior to concluding the settlement. The parties engaged in discovery for three years. Both the parties and Judge Conner had prepared for trial when the latter suggested settlement. Two days of conferences before Judge Conner then led to four months of negotiations between the parties.

public presumably will reimburse eventually. On the other hand, there is another potential challenger to the patent. Even more important, the licensing agreement bound appellants for a term of only two years, less than half of which remained to run at the time they filed the instant suit. The public's interest in the invalidation of these patents therefore can be vindicated after an immaterial delay without sacrificing its interest in the integrity of the settlement process.

The majority attempts to deflect the thrust of *Aro* with what seems to me to be a pair of mutually contradictory propositions. On the one hand, it draws a heavy line on the side of implementing *Lear* policy because the case-by-case "balancing of interests" suggested by *Aro* leaves the parties "at the mercy of . . . an imprecise and uncertain test." Ante at 188. Yet on the other hand it also suggests that a settlement agreement containing an "explicit prohibition" of future licensee suits "may" be enforced. But the majority does not explain how such future suits are to be decided other than by balancing the conflicting interests which invariably arise whenever a patentee asks that preclusive effect be given to some earlier disposition that fell short of full adjudication. Under the majority's formulation the courts will be engaged in the delicate process of working out the contours of the *Lear* rule for some time to come. Pending completion of this task parties necessarily will face prolonged legal uncertainty. Needless postponement of answers to the hard questions will not benefit them in the long run.

Significantly, as noted above, the majority does not hold that a settlement agreement concluded in connection with a stipulated dismissal without prejudice never can be given preclusive effect. It holds out the possibility that the *Lear* policy "may" be overcome if a settlement agreement "contains an explicit prohibition on licensee suits during some future period." Ante at 188.

The majority apparently finds the instant agreement to lack preclusive effect because it prohibits only "termination" and not "suit". Accepting what I presume would be the majority's willingness to enforce this agreement if the requisite language were present, I differ with the majority only on a matter of contract construction. Here I would hold that the parties' specific two year nontermination clause necessarily implies a two year moratorium on litigation.

Any other construction would ignore significant circumstances surrounding the making of this contract. The parties were before the district court ready for trial. Appellee, understandably hoping to be rid of this litigation on a permanent basis, initially asked for a consent decree which would have established infringement and validity. But appellants, looking ahead to the eventual delisting of Red No. 2, insisted that they be bound for no longer than two years. In acceding to this proposal and in settling for $200,000 in exchange for release of its claims for past infringement, appellee certainly was entitled to assume that it was agreeing to a two year moratorium on litigation. Any other construction would attribute to appellee the improbable action of signing a settlement agreement which would permit appellants to return to court the very next day with not only a new complaint but an escrow motion which could bar any return on the contract for an indefinite period. I recognize that *appellants'* position regarding a two year moratorium on suit is equivocal. But given their expectations at the time the settlement was concluded, a moratorium certainly would not have been inimical to their interests. In light of the importance to appellee of freedom from suit and bearing in mind that what is here involved is the settlement process and not normal contract negotiations, I think that a fair assessment of the parties' intent strongly indicates a two year preclusion from suit.[3]

---

**3.** The majority correctly points out, by analogy to a liquidated damages clause, that through the non-termination provision the licensing agreement brought the appellee beneficial rights above and beyond a means to preclude a new complaint. To be sure, the licensing agreement necessarily had to have this effect in order to be valid. But, in view of the arsenal of

The majority construes the instant contract to permit immediate relitigation not based on the parties' intent but by invoking a presumption favoring litigation grounded in *Lear.* This strikes me as bringing *Lear* policy in at a premature stage. Settlements, like other contracts, are to be construed to effectuate the parties' intent. If it appears after that inquiry that the parties intended their agreement to have preclusive effect, then a question arises under *Lear.* If the preclusive term violates public policy, then it can be overridden by the *direct* application of *Lear.*

I would affirm the judgment of the district court which dismissed the declaratory judgment action seeking patent invalidity.

weapons available to a post-*Lear* licensee and the expense of patent litigation, a licensing agreement lacking preclusive effect would have been of dubious practical utility to appellee.

Significantly, appellee's counsel stated at oral argument that appellee at present is in the process of disposing of its interest in the patents.