NINTENDO OF AMERICA
INC., Plaintiff,

v.

The MAGNAVOX COMPANY and
Sanders Associates, Inc.,
Defendants.

No. 86 Civ. 1606 (LBS).

United States District Court,
S.D. New York.

May 11, 1987.

As Amended May 21, 1987.

Mudge Rose Guthrie Alexander & Ferdon, John J. Kirby, Jr., Shelley B. O'Neill and Robert J. Gunther, Jr., New York City, for plaintiff; Morgan & Finnegan, Alfred P. Ewert, New York City, of counsel.

Newman, Williams, Anderson & Olson, Theodore W. Anderson, James T. Williams and Richard A. Cederoth, Chicago, Ill., for defendants; Fitzpatrick, Cella, Harper & Scinto, John Thomas Cella and John A. Krause, New York City, of counsel.

OPINION

SAND, District Judge.

The world of video games provides the background for this complex and far from playful patent litigation. Plaintiff, Nintendo of America Inc. ("Nintendo"), sues for a declaratory judgment alleging, *inter alia,* that certain of defendants' video game patents are invalid and/or unenforceable because the attorneys who prosecuted the patents obtained their issuance by deliberately concealing an important prior art reference from the United States Patent and Trademark Office ("PTO").

This Opinion addresses the motion of the defendants, the Magnavox Company

("Magnavox") and Sanders Associates, Inc. ("Sanders"), to dismiss Nintendo's declaratory judgment action insofar as it relates to the validity of one of the patents named in the complaint, U.S. Reissue Patent No. 28,598 (" '598"). The motion is granted.

## I. *History of the Litigation*

Nintendo's complaint centers on the validity of three patents: the '598, U.S. Reissue Patent No. 28,507 (" '507"), and U.S. Patent No. 3,728,480 (" '480"). Defendant Sanders is the owner of the patents-in-suit. Defendant Magnavox is the exclusive licensee of Sanders with respect to the '507, '598, and '480 patents.

Soon after Nintendo commenced this declaratory judgment action, defendants moved for a preliminary injunction, seeking to enjoin Nintendo's sale of certain video games which defendants alleged infringe the '507 patent. In the preliminary injunction motion, defendants relied in part on three prior opinions by federal district courts adjudicating the validity as well as claimed infringement of the '507. The most recent of the decisions, *The Magnavox Co. v. Activision,* C–82–5270 (N.D.Cal. Dec. 27, 1985), held that certain Atari video game cartridges infringe the '507 patent and that the '507 patent is valid over the prior art cited at the trial. Appeal of the *Activision* decision is presently pending before the Court of Appeals for the Federal Circuit.

At this Court's suggestion, Magnavox and Sanders agreed to consolidate the preliminary injunction motion with the trial on the merits. An expedited trial and discovery schedule was set. Thereafter, defendants filed two amended counterclaims, the most recent of which (January 12, 1987) alleges infringement of the '507, U.S. Patent No. 4,395,045 (" '045") and U.S. Patent No. 3,829,095 (" '095"). Infringement of the '598 is not, and has never been, alleged in these proceedings. On December 23, 1986, Nintendo filed a motion for partial summary judgment seeking a declaration that as a matter of law the '507 and '598 patents are unenforceable due to the defendants' "inequitable conduct" in the prosecution of the patents before the PTO. Defendants cross-moved for summary judgment on the same issues. In addition, they moved to dismiss the declaratory judgment action insofar as it relates to the '598 patent as non-justiciable.

The summary judgment motions will be addressed in a later opinion, subsequent to the Federal Circuit's decision with respect to the '507 patent in *Activision.* The '598 patent is not at issue in *Activision* and the resolution of the motion to dismiss the action with respect to that patent need not await the outcome of the *Activision* appeal. Accordingly, we decide at this time defendants' motion to dismiss Nintendo's '598 declaratory judgment action.

## II. *Discussion*

■ A party seeking a declaratory judgment must demonstrate under the "totality of the circumstances" the existence of an "actual controversy" to satisfy the requirement of 28 U.S.C. § 2201. *International Medical Prosthetics Research Assoc. v. Gore Enterprise Holdings, Inc.,* 787 F.2d 572, 575 (Fed.Cir.1986); *see also C.R. Bard, Inc. v. Schwartz,* 716 F.2d 874, 880 (Fed.Cir.1983). A justiciable controversy is present in the patent setting if the defendant's conduct has created on the part of the declaratory plaintiff "a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question," and the plaintiff has "actually produced the accused device" or has "prepared to produce such device." *Jervis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388, 1398–99 (Fed.Cir.1984). It is settled that the "reasonable apprehension must be an objective, not purely subjective apprehension." *International Medical Prosthetics,* 787 F.2d at 575; *see also Indium Corp. of America v. Semi-Alloys, Inc.,* 781 F.2d 879 (Fed.Cir.1985). The burden is on the declaratory plaintiff "to establish that jurisdiction over its declaratory judgment action existed at, and has continued since, the time the complaint was filed." *International Medical Prosthetics,* 787 F.2d at 575. To satisfy its burden, the plaintiff must demonstrate " 'the existence

of facts underlying' an allegation that an 'actual controversy' existed." *Id.* at 575–76, quoting *Jervis B. Webb Co.*, 742 F.2d at 1399.[1]

■ With these principles in mind, we turn to the circumstances that bear on whether there is a justiciable controversy with respect to the '598 patent. It is necessary to review the facts in some detail.

In 1977, Nintendo's Japanese parent company, Nintendo Co., Ltd., and Magnavox entered into a contract pursuant to which Magnavox sub-licensed to Nintendo Co., Ltd. some 97 patents and patent applications. Included within the array of licensed patents is the '598, which had been re-issued by the PTO in October 1975, and the '507, which had been re-issued in August 1975.

Both the '598 and the '507 patents were the subject of litigation in a Chicago federal court prior to the Magnavox-Nintendo Co., Ltd. agreement. In a March 1977 letter to Nintendo Co., Ltd.—before the execution of the license—Magnavox informed the company of the outcome of the litigation. Magnavox's letter recites that the "proposed video game license agreement" states that "[t]o the best of Licensor's knowledge, all LICENSED PRINCIPAL and SECONDARY PATENTS are valid, but Licensor does not guarantee the validity thereof." The letter goes on to report that the Chicago federal court "found that U.S. Patent No. Re. 28,507 is valid, but ruled that certain claims of U.S. Patent No. Re. 28,598 are invalid. The decision, however, is not final and may be appealed." *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint as to United States Patent Re. 28,598 ("Plaintiff's Memorandum") at Ex. D.

Several months later, in August 1977, Magnavox again reported the outcome of the Chicago patent infringement action with regard to the '598 and '507 patents. Magnavox noted that the Chicago court found certain claims of the '598 invalid by reason of being obvious in light of the '507 but observed that "[t]he remaining claims of United States Patent No. Re. 28,598, of course, are presumed to be valid." *Id.* at Ex. E.

The record reflects that approximately eighteen months passed before the parties again referred to the '598 patent in correspondence. In April 1979, apparently in response to a Nintendo letter, Magnavox again explained the outcome of the Chicago litigation with respect to the '507 and '598. *Id.* at Ex. F.

It should be noted at this point that in April 1978 Sanders filed a disclaimer with respect to eight of the claims of the '598 patent, a disclaimer which was formally published on August 29, 1978 in the Official Gazette of the PTO. *See* Exhibit 3 to Defendants' Motion to Dismiss the Complaint as to United States Patent No. Re. 28,598. Defendants point out that they "have not brought a single action on the '598 patent since certain claims of it were found invalid in 1977 and disclaimed, while they have sued numerous parties on the Re. 28,507 patent." Defendants' Reply Memorandum in Support of their Motion to Dismiss the Complaint as to United States Patent No. Re. 28,598 at 3.

As part of its ongoing enforcement efforts, Magnavox initiated further litigation with respect to the '507 patent. By letter dated August 27, 1982, Magnavox informed Nintendo Co., Ltd. of the district court's decision in *The Magnavox Co. v. Mattel, Inc.*, 216 U.S.P.Q. 28 (N.D.Ill.1982), in which the court decided that Mattel had infringed the '507 patent. *See* Affidavit of Howard C. Lincoln ("Lincoln Affidavit") at ¶ 25 (March 14, 1986). The '598 was not at issue in the *Mattel* suit.

---

**1.** Whether, as plaintiff contends, an "actual controversy" need exist only at the time the complaint is filed in a declaratory judgment patent case is a question which the Federal Circuit appears to have answered in *International Medical Prosthetics*, 787 F.2d at 577 (district court directed on remand to determine whether plaintiff has established "that an objective basis existed [when the complaint was filed] and still exists for a reasonable apprehension that it would be sued for infringement...."). *See also Jervis B. Webb Co.*, 742 F.2d 1388, 1398 n. 6 (Fed.Cir.1984).

The oft-litigated '507 patent subsequently became a source of controversy between Magnavox and Nintendo—a controversy that would eventually contribute to the onset of this litigation. In 1982, Nintendo ceased payment of royalties to Magnavox under the license. *See* Plaintiff's Memorandum at 4. In September 1983, Magnavox notified Nintendo Co., Ltd. that it considered the "POPEYE" video arcade game as an infringement of the Japanese counterpart of the '507.

Six months later, in April 1984, Nintendo sent Magnavox sample cartridges of certain Nintendo video games. Magnavox responded the following month and advised in a May 17, 1984 letter that in its view five Nintendo games and seven Nintendo cartridges, including many of those previously sent to Magnavox, were covered by the '507. Magnavox also described its claims in *Activision*, noting that Magnavox alleged that thirteen Activision cartridges infringed the '507. Finally, Magnavox noted that it was unable to operate Nintendo's "Wild Gunman" cartridge, which Nintendo had sent Magnavox in the April 1984 packet. Magnavox stated:

> In addition to the Re. '507 patent, we are the exclusive licensee under several of Sanders patents, including Re. 28,598, containing claims directed to target games played with photosensitive gun. However, because of the problems with the pistol, I was unable to determine whether your Wild Gunman game is covered by any of the Sanders' patents.

This is the last time, as reflected in the record, that Magnavox mentioned the '598 patent prior to the filing of Nintendo's complaint in this action.

By letter dated June 1, 1984, Nintendo indicated to Magnavox that it would send a duplicate "Wild Gunman" unit for inspection as well as "Golf," another cartridge. Nintendo stated: "[w]hen you have completed your evaluation of WILD GUNMAN, we would like to know which of the claims in that '598 reissue are alleged to cover this game." There was no reply.

In a subsequent letter, dated September 25, 1984, Nintendo's patent counsel again raised the issue of the '507 patent and argued extensively that Nintendo's products do not infringe the '507. The '598 was not mentioned. *See* Defendants' Motion to Dismiss the Complaint as to United States Patent No. Re. 28,598 at Ex. 6.

It appears that there were no discussions or communications between Nintendo and Magnavox between November 1984 (when the '507 patent was again discussed) and June 1985. *See* Lincoln Affidavit at ¶ 35. By letter dated June 26, 1985, Magnavox served on Nintendo Co., Ltd. a notice of default under the 1977 license agreement specifying that Nintendo Co., Ltd. had failed to make required royalty payments in connection with the sale of the six Nintendo home video cartridges which, in the May 17, 1984 letter, Magnavox had expressly claimed were covered by the '507 patent. "Wild Gunman," the Nintendo cartridge which Magnavox had referred to over a year earlier in connection with the '598 patent, was not mentioned. *See* Plaintiff's Memorandum at Ex. K. A "Notice of Termination" soon followed. *Id.* at Ex. L.

In January 1986, defendants informed Nintendo of the district court's decision in *Activision*, in which the court found that the '507 patent was valid and infringed by certain Atari products. *See* Lincoln Affidavit at ¶ 39. According to Nintendo's patent counsel, Magnavox advised Nintendo of Magnavox's belief that the *Activision* decision as to the '507 answered "all of Nintendo's questions" with regard to how Nintendo's products infringed defendants' patents. *Id.* at ¶¶ 38–39. On February 3, 1986, soon after the district court decision in *Activision*, Nintendo's patent counsel requested that Magnavox identify the products "other than those listed in your May 17, 1984 letter [which] infringe the '507 patent or any other of your video game patents." *See* Plaintiff's Memorandum at Ex. N. Additional Nintendo video game cartridges were enclosed with this letter. Two weeks later, Nintendo's patent counsel placed a follow-up call to Magnavox's patent counsel who, Nintendo's counsel affirms, stated that Nintendo's "infringe-

ment study" had not been completed. *See* Lincoln Affidavit at ¶ 41. A week later, Nintendo brought the present declaratory judgment action.

As noted earlier, defendants promptly moved for a preliminary injunction enjoining Nintendo from infringing the '507 by making, using, and selling the games which led to Magnavox's "termination" of the license. The '598 was not at issue in defendants' motion. In their answer to Nintendo's complaint, defendants admitted that "in or about May, 1984," Magnavox advised Nintendo that it was "investigating whether NINTENDO AMERICA'S 'Wild Gunman' game was covered by the '598 patent." Answer to Complaint and Counterclaim ¶ 18. However, defendants denied that a controversy existed as to the '598. Defendants subsequently confirmed this position in their answer to the plaintiff's second set of interrogatories. In the response to Interrogatory No. 4, for example, defendants stated that they "are not asserting any claims of Reissue Patent No. 28,598 against plaintiff Nintendo."[2] Plaintiff's Interrogatory No. 5 and defendants' response thereto made this additionally clear:

*INTERROGATORY NO. 5*

If the answer to interrogatory 4 is negative, state whether defendants contend that plaintiff infringes any valid claim of Reissue Patent No. 28,598, and, if so:

(a) Identify each such claim and each product alleged to infringe each such claim; and

(b) On an element by element basis identify where each element of each asserted claim is found in each product accused of infringement.

*Answer:* No; see answer to Interrogatory No. 4.

2. Interrogatory No. 4 and the full response read as follows:
   *INTERROGATORY NO. 4*
   State whether defendants acknowledge that they are collaterally estopped from asserting Reissue Patent No. 28,598 against Nintendo.
   *Objection:* Defendants object to the use of the term "collaterally estopped" in the present

In the Court's view, plaintiff has not established that the circumstances described are sufficient to create an "actual controversy" with regard to the '598 as opposed to the '507 patent. *International Medical Prosthetics*, 787 F.2d at 575. The required reasonable apprehension of an infringement suit was not present at the time the complaint was filed and is not present at this time. As we noted, certain claims of the '598 are concededly not valid and have been expressly disclaimed. While plaintiff points out that the defendants believe the remaining '598 claims are valid and have continued to license the '598, there is insufficient evidence that defendants have directly or indirectly threatened to sue Nintendo for infringement with respect to specific products Nintendo makes or sells. The existence of a patent is not in and of itself a basis for the assertion of an objectively reasonable apprehension of suit. *International Medical Prosthetics*, 787 F.2d at 576. The fact that in May 1984 the defendants investigated whether "Wild Gunman" infringes the '598 was not a sufficient basis, in light of the other circumstances, to generate a reasonable apprehension of an infringement suit based on that patent at the time the complaint was filed in early 1986. In the interim, when Magnavox expressly set forth in correspondence which Nintendo products Magnavox believes required royalty payments, the patent which was at issue was clearly the '507.

In many of the cases in which a declaratory judgment action is held justiciable, the facts present a much more concrete indication of an actual or imminent controversy. For example, in *C.R. Bard*, 716 F.2d 874 (Fed.Cir.1983), one of the cases on which Nintendo relies, the patentee had filed a state court action for failure to pay royalties on sales of a product which embodied the patented invention. Also, the court in *C.R. Bard* noted that among the claims in

interrogatory as being vague and meaningless without some identification of a possible basis for such estoppel.
   *Answer:* To the extent that the present interrogatory is understood, no; defendants are not asserting any claims of Reissue Patent Re. 28,598 against plaintiff Nintendo.

the state court action was one "under which [the declaratory plaintiff] may be charged with active inducement of infringement and contributory infringement." 716 F.2d at 881.

Similarly, in *Micro-Mega S.A. v. Jacklich*, 225 U.S.P.Q. 529 (E.D.N.Y.1985) [Available on WESTLAW, DCT database], which plaintiff cites for the proposition that the declaratory judgment requirement of a charge of infringement be liberally construed, the facts suggested the presence of such a charge. The defendant had sent a letter to plaintiff's distributor informing him that the product it was selling for the plaintiff violated defendant's patent. The court observed that this correspondence with a third party "impliedly charged [plaintiff] itself with infringement." *Id.* at 532. Other courts have also held that an "actual controversy" exists when a patentee or licensor advises third party customers or distributors of the federal declaratory plaintiff that a patent dispute exists between the patentee or licensor and the federal declaratory plaintiff. *See Societe de Conditionnement en Aluminum v. Hunter Engineering Co.*, 655 F.2d 938 (9th Cir.1981); *Dyform Concrete (Prestressed) Ltd. v. Spiroll Corp.*, 370 F.Supp. 290 (D.Minn.1973).

*Warner-Jenkinson Co. v. Allied Chem. Corp.*, 567 F.2d 184 (2d Cir.1977), provides perhaps the strongest support for plaintiff's position but does not alter our conclusion. In that case, plaintiff, a licensee of defendant, sought a declaration of invalidity of two patents covering the chemical composition and production of a food coloring known as Red No. 40. The court, holding that an actual controversy was present, observed that one action on the part of plaintiff—the non-payment of royalties— would leave plaintiff vulnerable to federal and state claims.

There were, however, significant contextual factors not present in this case which permeated the underlying controversy in *Warner-Jenkinson* and which rendered a conflict there more than hypothetical. Specifically, after the Food and Drug Administration announced the imminent de-listing of Red. No. 2, plaintiffs sought a license from defendant Allied to produce Red No. 40, which the Second Circuit described as "the only practicable alternative to Red No. 2." *Warner-Jenkinson*, 567 F.2d at 185. Allied refused. After plaintiff filed suit, a settlement ensued which released plaintiff from Allied's claims of past infringement and established a royalty arrangement for the use of Red No. 40. At that point, the FDA had yet to de-list Red No. 2. Subsequently, the FDA de-listed Red No. 2 and a much heavier use of Allied's Red No. 40 became necessary. Plaintiffs asked Allied to reduce the previously determined royalty rate. Allied declined to do so. Thereafter, one of the licensees involved in the original action brought suit again—this time seeking an order allowing payment of royalties into an escrow fund. In this factual setting, where the product which plaintiff manufactured was clearly the subject of an ongoing business dispute, the court found a reasonable apprehension of infringement.

In the case at bar, with respect to the '598, as opposed to the '507, similarly significant contextual factors are not present. The correspondence between the parties demonstrates that the primary focus has been on the '507. Magnavox's notice to Nintendo of the occurrence of a default under and the termination of the 1977 license agreement were clearly predicated on allegations of infringement of the '507, not the '598. That Nintendo's suit was filed soon after Magnavox notified Nintendo of the *Activision* decision upholding the validity of the '507 patent further suggests that the "actual controversy" between the parties centers on the '507. Finally, the interrogatories cited and the correspondence between the parties confirms the existence of a concrete controversy over the relationship between specific Nintendo products and the '507 patent, rather than the '598 patent.

What the record reflects as to the '598 is not sufficient to sustain Nintendo's burden. The record indicates that the defendants believe that certain claims of the '598 are valid and in May 1984 undertook to investigate Nintendo's "Wild Gunman" product.

The next relevant event occurring after Magnavox received Nintendo's games and cartridges in 1984 (including "Wild Gunman") was Magnavox's notification to Nintendo that the sale of specific products, previously identified by Magnavox as being covered by the '507, required the payment of royalties and that Nintendo's failure to make the payments constituted a default under the 1977 license agreement. Neither the '598, nor "Wild Gunman," were mentioned at that point or at any later time by defendants until Nintendo filed the present action. While our appraisal of the "totality of the circumstances," *International Medical Prosthetics,* 787 F.2d at 575, includes a consideration of the fact that the licensing relationship between Nintendo Co., Ltd. and Magnavox has broken down and that defendant continued to license to others the '598 patent after certain claims thereof were declared invalid, it is critical to focus on which of the 97 patents and patent applications licensed to Nintendo Co., Ltd. in the 1977 agreement are the source of the controversy. We conclude that there is no "actual controversy" with respect to the '598.

We note that the '507 was reissued just a few months prior to the reissue of the '598. Our conclusion that there is no "actual controversy" as to the '598 does not mean that in deciding issues relating to the '507 patent, inferences may not be drawn based on the conduct of the defendants subsequent to the reissue of the '507.

### Conclusion

Defendants' motion to dismiss the complaint as to the '598 patent is granted.

SO ORDERED.