ACMAT CORPORATION, Plaintiff,

v.

GREATER NEW YORK MUTUAL
INSURANCE COMPANY,
Defendant.

No. 3:96 CV 1153 (GLG).

United States District Court,
D. Connecticut.

July 26, 1999.

John W. Lemega, Michael S. Taylor, Halloran & Sage, Hartford, CT, for Plaintiff.

Richard R. Brown, Brown, Paindiris & Scott, Hartford, CT, for Defendant.

Thomas C. Clark, Tyler Cooper & Alcorn, Hartford, CT.

## OPINION

GOETTEL, District Judge.

Following a bench trial, this constitutes the Court's opinion.

### THE PLEADINGS

Plaintiff seeks a declaration that the defendant issued an insurance policy providing comprehensive general liability insurance and products liability insurance with limits of liability of $500,000 per person and $1,000,000 per accident during the period January 1, 1964 to January 1, 1968. Specifically, plaintiff seeks a declaratory judgment that the policy was valid and in force during that period and also for money damages, counsel fees, and punitive damages. Defendant, in addition to denying that such policies ever existed, argues that this case does not present a justiciable case or controversy since plaintiff does not seek a defense or indemnity for any claims, that plaintiff lacks standing because there is no recognizable injury such that a favorable result would not redress any alleged injuries, and that the case

should not be heard because it can only result in piecemeal litigation.

## THE FACTS

The evidence at trial focused on whether Greater New York Mutual Insurance Company had issued comprehensive general liability policies and products liability policies covering ACMAT, a Connecticut corporation, formerly known as The Acoustical Materials Corporation ("Acoustical Materials"), during the period January 1, 1964, to January 1, 1968.

Despite diligent searches, neither party has been able to locate the insurance policies in question, which have apparently been long since destroyed. The existence of insurance covering plaintiff was further complicated by the fact that Acoustical Materials was formerly one of ten to fifteen subsidiary corporations of a New York corporation, Waldvogel Brothers, Inc. Plaintiff's president and CEO, Henry Nozko, testified that, in order to save money, he had obtained a single policy for plaintiff's then-parent company, Waldvogel, and for a number of other Waldvogel subsidiaries, some of which had names similar to plaintiff's but were incorporated in other states, and others of which were exterminating companies in a different line of business. (Plaintiff was engaged primarily in the installation of acoustical ceilings). While all of these companies were subsidiaries of Waldvogel, plaintiff held no interest in any of the other acoustical material companies—i.e. they were sister companies, related only through the parent corporation. The plaintiff's relationship with Waldvogel ended in 1969, when Waldvogel was dissolved, and the present owners purchased the stock of Acoustical Materials. In 1971, its name was changed to ACMAT Corporation.

The evidence at trial established that, in the 1960's, the plaintiff, which had its principal place of business in East Hartford, Connecticut, had obtained insurance coverage under several insurance policies from the May, Potter & Murphy Insurance

Agency in Hartford, Connecticut. Plaintiff's President Henry Nozko as well as their insurance agent, Frank Kramer, testified unequivocally that this insurance was issued by Greater New York Mutual Insurance Company. Indeed, at some point, Nozko and Kramer traveled to New York City to visit defendant's home office. The manager of defendant's Hartford office, Stuart Kessler, also testified that he had issued Greater New York Mutual insurance policies for comprehensive general liability coverage, which usually included products liability coverage, and workmen's compensation coverage to Acoustical Materials Corporation. He testified that he had authority to issue policies for Greater New York Mutual and did most of the underwriting on these particular policies himself, but sent the account to the home office in New York City for final approval because of the unusual nature of some of the businesses being insured, in particular, the termite businesses.

Other than this testimony, the most convincing documentary evidence that general liability and products liability coverage had been written by defendant was a certificate of insurance on Greater New York Mutual Insurance Company letterhead, dated December 31, 1964, and signed by Stuart A. Kessler, for a contract to be performed by Acoustical Materials in Ohio. The certificate of insurance showed the insured as "The Acoustical Materials Corporation," and indicated that the following policies with expiration dates of January 1, 1966, were in effect: a products liability and comprehensive general liability policy no. 17-03-000627, including completed operations insurance, with $500,000/$1,000,000 BI limits and $250,000 PD limits; a comprehensive automobile liability policy no. AC 901 with $500,000/$1,000,000 BI limits and $250,000 PD limits; and a workmen's compensation and employer's liability policy no. 16-06-000381 with per person limits of $100,000. Although a certificate of insurance does not confer coverage, it is evidence that an authorized representative

of defendant had certified that as of December 31, 1964, certain policies of insurance were in effect with expiration dates of January 1, 1966.

There was also testimony that all of Waldvogel subsidiaries were listed as named insureds on the policies issued by Greater New York Mutual, although there was no documentary evidence to support this assertion. There was also one letter from defendant addressed to Waldvogel at plaintiff's principal office in East Hartford, Connecticut, (Waldvogel's office was in New York), pertaining to a workmen's compensation claim. This would lend some support to plaintiff's contention that Waldvogel was also on the policy.

There was no proof of premiums having been paid to purchase a commercial general liability policy. Frank Kramer did testify that, during the mid–1960's, after defendant had audited the companies' loss records, it would issue a statement for retroactive premiums due and owing by the named insureds and that the president of Acoustical Materials insisted that he divide the additional premium payment among the various named insureds, Waldvogel and its subsidiaries. Warren Heck, President of Greater New York Mutual, however, denied that his company would ever have produced a combined audit.[1]

In 1968, Acoustical Materials claims to have switched its insurance coverage from defendant to The Aetna. Documents produced by Aetna's successor relate to Aetna's quoting a premium for this new account for the same coverages that had previously existed, and in an account report indicate the "estimated premiums" Waldvogel had been paying Greater New York Mutual. Although these figures were in 1967 dollars,[2] Warren Heck, the current president of Greater New York

Mutual indicated that these premium levels were not high enough to cover the ten or fifteen companies which plaintiff's witnesses testified were jointly insured.

The evidence did establish that a workmen's compensation policy was issued by Greater New York Mutual Insurance Company to Acoustical Materials and was in effect for the years 1965, 1966 and 1967, based upon claims submitted to Greater New York Mutual for employees of Acoustical Materials. In fact, defendant indicated at trial that it was not contesting that workmen's compensation coverage had been provided. Whether there was a workmen's compensation policy in effect in 1964 is more questionable. (The reason this is significant is that plaintiff was trying to show that all of its coverage, not just the workmen's compensation, was in effect during the years 1964 to 1968).

The only evidence supporting the existence of a 1964 workmen's compensation policy is a single claim for an injury in 1964 and information contained in a letter from the Interstate Compensation Rating Bureau dated 1/29/68, addressed to Greater New York Mutual and three other insurance companies that were apparently quoting insurance premiums for Waldvogel and its subsidiaries, indicating that the Bureau needed "unit statistical cards" from Greater New York Mutual on policy no. 16–31–00381, with an effective date of 1–1–64. This number corresponds to the policy number shown on the Certificate of Insurance for the workmen's compensation policy. Also, an interoffice memorandum from Aetna's files dated November 30, 1967, indicates that the Waldvogel account had been handled by the May, Potter and Murphy Agency for four years by Greater New York Mutual.

1. The testimony of Heck and Kramer is not necessarily inconsistent since each subsidiary could have been audited separately but a single retroactive premium charged based upon the overall results of the audits.

2. According to the Bureau of Labor Statistics Consumer Price Index for the United States (Urban), for all items less food and energy, it would take approximately $5.00 in 1999 to purchase what $1.00 would have purchased in 1967.

While there was evidence showing that claims were filed for several years under the workmen's compensation policy, the only reference to claims being filed under the general liability policy was a general reference in Aetna's interoffice memorandum referred to above.

Nevertheless, we find that there was sufficient evidence from which we could conclude, if appropriate to do so, that comprehensive general liability and products liability insurance policies were issued by Greater New York Mutual, covering Acoustical Materials, from at least 1965 until the end of 1967.

However, even if we were to find that these policies existed, there was no proof of the contents of the policies. Plaintiff attempted to overcome this problem by producing several policy forms that were in existence at various times during the 1950's and 1960's, as evidenced by an "edition date" at the bottom of the policy form. When a new policy form was introduced, it could not be used until approval was obtained from the various state departments of insurance. Plaintiff was unable to establish that any of the forms were used for the policies whose existence it seeks to establish or the dates that these various forms were used by defendant. Plaintiff showed only that similar provisions would probably have appeared in some Greater New York Mutual policies. Further, if the comprehensive general liability policy and the products liability policy were in force for the years 1965, 1966, and 1967, they would have been yearly policies subject to renewal. Upon renewal, the policies, including the insuring clause, would likely have changed sometime during the mid- to late–1960's, when the policies were changed from covering "accidents" to "occurrences." Additionally, defendant's president testified that the policies at issue would not have been standard form policies, since defendant did not commonly issue the type of coverage plaintiff claims, and would have been custom-made for the type of insureds involved.

## THE LAW

■ Before we reach the merits of the dispute between the parties, however, we must first determine whether this federal court has subject matter jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). While the complaint alleges in conclusory fashion that the amount in controversy exceeds $50,000 (the required amount when this complaint was filed in 1996), there was no proof whatsoever of any monetary amounts having been expended by the plaintiff or of claims being having been made by other parties. Although plaintiff seeks monetary damages, if we were to find in its favor, we have no basis from which to calculate damages. This, along with other considerations, leads us to conclude that the requisite jurisdictional amount does not exist for us to exercise diversity jurisdiction over plaintiff's complaint. Moreover, there may be no justiciable case or controversy and, at most, this would be the first of two or more litigations. Before reaching those questions, however, we begin with the more basic question of federal jurisdiction: has the plaintiff proved an amount in controversy of $50,000 or more?

■ The Declaratory Judgment Act provides that "[i]n case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought...." 28 U.S.C. § 2201. This Act, however, does not confer federal subject matter jurisdiction; there must be an independent basis for it. *Warner–Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184 (2d Cir.1977); *Maryland Cas. Co. v. Rosen*, 445 F.2d 1012 (2d Cir.1971). Jurisdictional requirements are no less merely because the action is for declaratory relief. Rowland H. Long, 3 *The Law of Liability Insurance*, § 26.05 (1983). In this case,

plaintiff invokes our jurisdiction under the diversity statute, 28 U.S.C. § 1332. Neither party disputes that diversity of citizenship exists. Rather, defendant argues that plaintiff, despite its categorical assertion in its complaint that the matter in controversy exceeds $50,000, has failed to meet the threshold jurisdictional amount. We agree.

 Although plaintiff has made passing reference to asbestos claims and asbestos litigation (Pl.'s Opp. to Def.'s Mot. for Judgment on the Pleadings and in a statement at oral argument), plaintiff has never asserted in its pleadings nor provided any evidence at trial that any claims have been filed against it or the amount of these claims. The burden of establishing subject matter jurisdiction in federal court rests upon the party seeking to invoke it, *Kheel v. Port of New York Authority*, 457 F.2d 46, 48–49 (2d Cir.1972), and the bare assertion of jurisdictional facts has been held insufficient to invest a federal court with jurisdiction. *See St. Paul Reinsurance Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir.1998).

The Supreme Court has held that the amount in controversy is not necessarily the money judgment sought or recovered, but rather the value of the consequences which may result from the litigation. *Smith v. Adams*, 130 U.S. 167, 175, 9 S.Ct. 566, 32 L.Ed. 895 (1889). In this case, we have no way of knowing what the value of this litigation is to plaintiff, for it has given us no indication of the amount of claims, if any, that have been asserted against it for which it is seeking coverage under the policies at issue. "There must be proof outside the policy that the controversy encompasses a presently existing claim or right of claim against the insured in the amount of more than [$50,000]." Long, *supra*, § 26–06 at 26–13. Thus, it has been said that a declaratory judgment action should not be predicated upon a possibility that the whole coverage of a liability policy will be obtained by a judgment against the insured. 20 John A. Appleman, *Insurance Law and Practice* § 11334 at 259–60 (rev. ed.1979). In this case, although plaintiff alleges that the amount in controversy exceeds $50,000, there is no evidence whatsoever to support this claim.

Accordingly, we find that we lack subject matter jurisdiction over plaintiff's complaint and dismiss this action without prejudice. *See Hernandez v. Conriv Realty Associates*, 182 F.3d 121 (2d Cir.1999).

**SO ORDERED.**