# United States Court of Appeals for the Federal Circuit

---

**BASELOAD ENERGY, INC.,**
*Plaintiff-Appellant,*

v.

**BRYAN W. ROBERTS,**
*Defendant-Appellee.*

---

2010-1053

---

Appeal from the United States District Court for the District of Columbia in case no. 08-CV-1838, Judge Paul L. Friedman.

---

Decided: September 9, 2010

---

JOHN M. WEYRAUCH, Dicke, Billig & Czaja, PLLC, of Minneapolis, Minnesota, argued for plaintiff-appellant. With him on the brief were PATRICK G. BILLIG and PAUL P. KEMPF.

WILLIAM T. BISSET, Hughes Hubbard & Reed LLP, of Los Angeles, California, argued for defendant-appellee. With him on the brief was JASON S. COHEN, of Washington, DC.

---

Before LOURIE, LINN, and DYK, *Circuit Judges.*

DYK, *Circuit Judge.*

Baseload Energy, Inc. ("Baseload") sought a declaratory judgment that U.S. Patent No. 6,781,254 ("the '254 patent") owned by Bryan W. Roberts ("Roberts") was invalid and unenforceable. On summary judgment, the district court held that the terms of a 2008 Settlement Agreement (the "Settlement Agreement") barred "all claims between the parties," including the present action. *See Baseload Energy, Inc. v. Roberts*, 654 F. Supp. 2d 21, 27 (D.D.C. 2009). We *reverse*, because we conclude that the language of the Settlement Agreement did not release either claims of infringement of the '254 patent or the accompanying defenses of invalidity or unenforceability.

## BACKGROUND

This action represents the second round of litigation between these parties and their affiliates concerning a so-called "flying electric generator" ("FEG"). In this action, Baseload is the plaintiff, and Roberts is the defendant. The FEG is a flying wind turbine, which harvests wind power and transmits it through tethers to ground stations linked to a utility grid. The '254 patent issued on August 24, 2004, to Roberts. The invention of the '254 patent comprises "[a] windmill kite for converting the kinetic energy of high altitude winds into useful work or other forms of energy." '254 patent col.7 ll.44-46. Roberts, the owner of the '254 patent, founded the Sky WindPower Corporation ("SWPC") to produce and market the FEG technology. SWPC's president is David Shepard ("Shepard"), while Roberts is SWPC's chairman. SWPC is the exclusive licensee of the '254 patent pursuant to a written agreement dated April 15, 2008.

David Resnick ("Resnick"), the founder and chief executive officer of Baseload, is a venture capitalist interested in wind energy projects. In June of 2006, Resnick expressed interest in a potential joint venture between SWPC and Baseload. Following a subsequent meeting, the parties allegedly entered into an oral agreement, by which SWPC and Roberts agreed to assign the '254 patent rights to a new venture, Sky Power LLC ("Sky Power"), a limited liability company that would be created specifically for the venture. SWPC and Roberts would receive an 80% interest in Sky Power, while Resnick would have a 20% ownership interest and would serve as the chief executive officer of Sky Power. Sky Power was to raise an equity investment of $30 million from additional investors for the development of the FEG project. A written agreement memorializing the oral agreement was prepared, but it was never signed by the parties. Baseload, in this action, alleged that in reliance on Resnick's understanding of the agreement, Resnick immediately began to perform under the contract, forming Sky Power LLC, developing a business plan, and contacting investors.

Subsequently, the relationship between Resnick and Roberts broke down. On May 4, 2007, Resnick and Sky Power initiated litigation in the United States District Court for the Southern District of California against Roberts, SWPC, and SWPC's president, Shepard, for various state law breach of contract, fraud, and promissory estoppel claims (hereinafter the "breach of contract" action). The complaint sought $1 million in compensatory damages for breach of contract, as well as an order compelling SWPC and Roberts' performance of the terms of the oral agreement. Complaint at 23-24, *Resnick v. Shepard*, No. 07-CV-0813-L (S.D.C.A. May 7, 2004). The complaint included no allegations of patent invalidity.

On March 19, 2008, the parties entered into the Settlement Agreement. The Settlement Agreement contained the following release provision, releasing claims that Resnick, Baseload, and Sky Power (collectively, the "Resnick Parties") could have brought against Shepard, SWPC, and Roberts (collectively, the "SWPC Parties"):

3. *Resnick Parties' Release.* Resnick, SPLLC [Sky Power], BEI [Baseload], and Grenier, on behalf of themselves, any entity in which any of them has an interest and any employee, affiliate, or co-owner of any such entity, and their respective spouses, agents, partners, members, representatives, heirs, attorneys, shareholders, officers, directors, employees, affiliates, parents, subsidiaries, successors and assigns (collectively, "Resnick Parties"), forever release and discharge Shepard, the Shepard estate, SWPC and Roberts, any entity in which any of them has an interest and any employee, affiliate or co-owner of such entity, and their respective predecessors, successors and present or former affiliates and their respective spouses, agents, members, representatives, heirs, attorneys, shareholders, officers, directors, employees, affiliates, parents, subsidiaries, successors and assigns (collectively, "SWPC Parties"), of and *from any and all losses, liabilities, claims, expenses, demands and causes of action of every kind and nature*, known and unknown, suspected and unsuspected, disclosed and undisclosed, fixed and contingent, whether direct or by way of indemnity, contribution or otherwise, that the Resnick Parties ever had, now have, or hereafter may have or be able to assert against the SWPC Parties by reason of any matter, cause or circumstance whatsoever arising or occurring prior to

and including the date of this Agreement, as stated in its first sentence, that arise from or relate in any way, directly or indirectly, to SWPC, the Resnick Action, the Grenier Action or any plan or effort to research or develop a flying electric generator ("FEG").

Settlement Agreement ¶ 3 (emphasis added). Paragraph 4 of the Settlement Agreement contained an identical release of claims that could be brought by the SWPC Parties against the Resnick Parties. *See id.* ¶ 4.[1] Paragraph 6 provided that the parties "hereto represent and warrant that they are aware of no right or claim, and no fact that might give rise to a right or claim, against a released party or his or its related persons and entities referred to in paragraphs 3 or 4 above that this Agreement does not effectively release." Additionally, the Settlement Agreement included an Option Agreement, by which Roberts and SWPC granted Baseload an option to acquire a nonexclusive license under the '254 patent at a price of $1.75 million, payable in installments; the Option

---

[1] Paragraph 4 contains language identical to Paragraph 3: "The SWPC Parties forever release and discharge the Resnick Parties of and from any and all losses, liabilities, claims, expenses, demands, and causes of action of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, fixed and contingent, whether direct or by way of indemnity, contribution or otherwise, that the SWPC Parties ever had, now have, or hereafter may have or, be able to assert against the Resnick Parties by reason of any matter, cause or circumstance whatsoever arising or occurring prior to and including the date of this Agreement, as stated in its first sentence, that arise from or relate in any way, directly or indirectly, to SWPC, the Resnick Action, the Grenier Action or any plan or effort to research or develop an FEG."

Agreement was appended to the Settlement Agreement as "Exhibit C," while the Nonexclusive Patent License ("the License Agreement") was appended as "Exhibit D."[2] The release expressly exempted disputes arising from the Option Agreement and License Agreement from the scope of the release. J.A. 78 ("Anything herein to the contrary notwithstanding, the releases given in paragraphs 3 and 4 above shall not cover or extend to any losses, liabilities, claims, expenses, demands and/or causes of action arising from or relating to the breach by any party of this Agreement or Exhibits C or D attached hereto."). Pursuant to a joint stipulation of the parties, the breach of contract action was dismissed by the district court.

On September 15, 2008, the option granted to Baseload pursuant to the Settlement Agreement lapsed when Baseload was unable to secure financing to pay the licensing fee. As a result, Baseload could not develop the FEG technology without risking an infringement suit brought by Roberts under the '254 patent. On October 27, 2008, Baseload filed this action against Roberts, seeking a declaratory judgment that the '254 patent is invalid and unenforceable.

Roberts moved for summary judgment on the ground that Baseload's claims were barred by the 2008 Settle-

---

[2] Paragraph 8 of the Settlement Agreement provides:

> Concurrently with the exchange of executed counterparts of this Agreement, SWPC, Roberts, BEI and Resnick shall exchange executed counterparts of an option agreement, in the form attached hereto as Exhibit C ("Option Agreement"), providing BEI an option to acquire a nonexclusive patent license pursuant to an agreement in the form attached hereto as Exhibit D ("Nonexclusive Patent License Agreement").

ment Agreement. The district court granted Roberts' summary judgment motion, concluding that the "unambiguous and expansive language" of the Settlement Agreement barred all claims deriving "from events occurring before March 18, 2008" and "aris[ing] from or relat[ing] in any way" to "any plan or effort to research or develop a flying electric generator." *Baseload*, 654 F. Supp. 2d at 26, 27. The court reasoned that both Roberts' and SWPC's infringement claims and Baseload's patent invalidity and unenforceability claims clearly fell within this category of claims, as the development and patenting of the FEG technology that is the subject of the '254 patent occurred before March 18, 2008, and was clearly related to an effort to research or develop a flying electric generator. The district court rejected Baseload's arguments that this release failed to meet the standard laid out by *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001), for the valid release of patent claims. It noted that while this court upheld the particular release provision laid out in *Flex-Foot*, "it did not announce that *only* provisions arising from precisely the same set of circumstances and containing the same or similar language could pass muster." *Baseload*, 654 F. Supp. 2d at 27. Baseload timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

This court reviews grants of summary judgment without deference. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007); *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1353 (Fed. Cir. 1998). Summary judgment is, of course, appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Baseload asserts that the correct law for us to apply in this case is Federal Circuit law, because the question of whether a settlement agreement bars a party from challenging the validity of a patent in a subsequent action is intertwined with the substance of enforcement of a patent right. *See, e.g.*, *Flex-Foot*, 238 F.3d at 1365 ("[W]hether public policy precluding patent license estoppel should extend to a waiver of validity challenges in a settlement agreement[] is intimately related with the substance of enforcement of a patent right. Therefore, we will apply our law to these issues."). Roberts appears to agree. Under *Flex-Foot*, we apply Federal Circuit law in resolving the issues in this case.

In *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), the Supreme Court eliminated the doctrine of "licensee estoppel," citing the "important public interest in permitting full and free competition in the use of ideas." *Id.* at 670. Under *Lear*, a licensee of a patent is not estopped from challenging the validity of the licensed patent by virtue of the license agreement. *Id.* at 671. In subsequent cases, our court and our predecessor court have confronted the question of whether consent decrees and settlement agreements may at one and the same time provide for a patent license while barring challenges to patent invalidity and unenforceability. We have held that *Lear* does not render such agreements unenforceable, because of the strong policy in favor of settlement of litigation and, in the case of consent decrees, the policy in favor of res judicata. *See Flex-Foot*, 238 F.3d at 1368 ("[T]he important policy of enforcing settlement agreements and res judicata must themselves be weighed against the federal patent laws' prescription of full and free competition in the use of ideas that are in reality a part of the public domain."); *Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 474-75 (Fed. Cir. 1991) ("In [the situation where litigation

is terminated by a consent decree which acknowledges a patent's validity], other public policy considerations come into play, namely, preserving the finality of judgments as well as the strong public policy of encouraging settlements."). Rather, the policies of *Lear* and the interests of settlement must be balanced. As we noted in *Foster*, "[b]arring subsequent challenges favors the public policy of encouraging voluntary settlement; at the same time, a narrow construction of such provisions favors challenges to validity. *Id.* 480. Thus, a balance in the policy expressed in *Lear* and the interest in encouraging settlement is achieved." The result is that invalidity and unenforceability claims may be released, but only if the language of the agreement or consent decree is clear and unambiguous.[3]

Baseload first argues that the district court erred in granting summary judgment because the Settlement Agreement fails to meet the standard set out in *Flex-Foot* for a valid release of patent claims. In *Flex-Foot*, the parties had settled two prior patent-related suits. 238 F.3d at 1363-64. The first suit, an infringement suit by Flex-Foot, Inc. ("Flex-Foot") against CRP, Inc. d/b/a Springlite ("Springlite"), resulted in a settlement agree-

---

[3]    *See Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1377 (Fed. Cir. 2002) (holding that the consent decree language "the '690 patent is a valid patent" was not sufficiently clear to foreclose a validity defense in a new infringement suit involving a new product); *Flex-Foot*, 238 F.3d at 1370 ("Based on the clear and unambiguous waiver of future challenges to the validity of the '363 patent in the settlement agreement voluntarily entered into by the parties in this case, we hold that Springlite is contractually estopped from challenging the validity of the '363 patent . . . ."); *Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999) ("[A]ny surrender of the right to challenge validity of a patent is construed narrowly.").

ment and a corresponding license agreement for U.S. Patent No. 4,822,363 ("the '363 patent") to Springlite that allowed Springlite to challenge patent validity in a later action. *Id.* at 1363. The second suit, a declaratory judgment action to invalidate the '363 patent brought by Springlite, proceeded through discovery and a fully briefed motion for summary judgment regarding Springlite's invalidity allegations. *Id.* While that motion was pending, however, the parties settled the case, resulting in the following settlement agreement:

> The CRP Group agrees not to challenge or cause to be challenged, directly or indirectly, the validity or enforceability of the '913 patent and/or the '363 patent in any court or other tribunal, including the United States Patent and Trademark Office. As to the '363 and '913 patents only, the CRP Group *waives any and all invalidity and unenforceability defenses in any future litigation, arbitration, or other proceeding.* This waiver applies to any product made, used, or sold by the CRP Group or any of their assignees, successors or those who act for or in concert with any of them at any time during the life of either the '363 or '913 patents.

*Id.* at 1364. In 1997, Flex-Foot filed a new complaint alleging that Springlite's product infringed the '363 patent. In accordance with the arbitration clause of the settlement agreement, the dispute was sent to an arbitration panel, which found that the device infringed the '363 patent. Springlite objected to the award on the ground that the '363 patent was invalid and unenforceable. The district court granted Flex-Foot's motion to enforce the arbitration award, concluding that Springlite was "collaterally estopped" from challenging the validity and enforceability of the '363 patent. *Id.*

We affirmed, once again reaffirming the requirement that the release language must be clear and unambiguous to release patent invalidity claims. We concluded that "[b]ased on the clear and unambiguous waiver of future challenges to the validity of the '363 patent in the settlement agreement voluntarily entered into by the parties in this case . . . Springlite is contractually estopped from challenging the validity of the '363 patent." *Id.* at 1370. We cited the following factors relevant to our analysis:

> Once an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent in suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding.

*Id.*

Baseload argues that these factors are determinative, and that the Settlement Agreement in this case is inadequate to release its patent invalidity claims, because the prior litigation between the parties did not involve patent invalidity issues or actual litigation on those issues. We disagree. Contrary to Baseload's argument, while the absence of a prior dispute and litigation as to invalidity is pertinent, we do not think that a settlement agreement is ineffective to release invalidity claims unless the exact circumstances described in *Flex-Foot* are present. Each case must be examined on its own facts in light of the agreement between the parties. In the context of settlement agreements, as with consent decrees, clear and unambiguous language barring the right to challenge

patent validity in future infringement actions is sufficient, even if invalidity claims had not been previously at issue and had not been actually litigated.

Here, however, there is no such clear language, and there was no release of either patent claims or defenses. There is no specific language in the settlement agreement making reference to invalidity issues. There is also reason to question whether the general language of the agreement was intended to cover such disputes. This is so because there was no issue in the breach of contract litigation concerning patent infringement or patent invalidity and unenforceability and no prior dispute between the parties as to such issues. Most importantly, the parties could not possibly have intended to release any and all patent infringement claims, because the Settlement Agreement granted Baseload an option to acquire a nonexclusive license to use the technology claimed by the '254 patent. The license provision would be unnecessary if all infringement claims under the '254 patent were released. At the same time, the parties could not have intended to bar infringement claims if the Resnick parties did not acquire a license. The parties must have intended to exclude infringement from the scope of the Settlement Agreement. We reached a similar conclusion in *Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.*, 540 F.3d 1337 (Fed. Cir. 2008). In that case, there were two settlement agreements, one including broader release language,[4] ("the New Jersey agreement") and a more narrowly tailored agreement ("the Massachusetts

---

[4] The release language stated that the agreement applied to "any and all manner of claims . . . that [Howmedica] . . . has, ha[s] had, or may have against Wright Medical . . . including, *but not limited to*, any and all claims and counterclaims that were or could have been asserted in the lawsuit." *Howmedica*, 540 F.3d at 1342.

agreement") that was limited to the claims or controversies that "were or could have been asserted" in the settling litigation over four patents. *Id.* at 1342. After the execution of the releases, Howmedica brought suit alleging infringement of U.S. Patent No. 5,824,100 ("the '100 patent"), which had not been at issue in the prior litigation. We held that broad release language of the New Jersey agreement did not cover claims of infringement of the '100 patent, because the companion Massachusetts agreement made clear that the release provision was only intended to resolve the previously pending litigation over four patents asserted in the first litigation (which did not include the '100 patent). *Id.* at 1350. The New Jersey settlement also included cross-licenses for four asserted patents, although there was no license under the '100 patent. We concluded that "[g]iven the structure of the agreements it is on its face unlikely that the parties would exclude the '100 patent from the cross-licensing provisions but effectively grant rights in the patent . . . by virtue of the release provision." *Id.*

Similarly, in this case it is impossible to read the Settlement Agreement in light of the license provision as releasing infringement claims relating to the '254 patent. If infringement claims were preserved, then it necessarily follows in the circumstances of this case that the defenses to infringement, including invalidity defenses, were also preserved. As we noted earlier, the language of the agreement is general and makes no specific reference to other patent claims or defenses. The language of the agreement cannot be read to distinguish between infringement and invalidity claims. There is nothing in the text of the Settlement Agreement to suggest in this case that somehow the infringement claims were preserved while patent invalidity defenses were released. Thus, the

clear and unambiguous language necessary to effect a release of patent invalidity defenses is not present.[5]

We conclude that the Settlement Agreement did not release the defenses of invalidity and unenforceability.

### REVERSED AND REMANDED

---

[5] It is also noteworthy that the license provision of the Settlement Agreement did not bar an invalidity challenge. In both *Lear* and in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), the Supreme Court held that a licensee under such an agreement may challenge the validity of the patent. *See MedImmune*, 549 U.S. at 135 (holding that a licensee could challenge the validity of the patent despite a promise to pay royalties on patents "'which have neither expired nor been held invalid by a court . . . .' Promising to pay royalties on patents that have not been held invalid does not amount to a promise *not to seek* a holding of their invalidity." (quoting the relevant agreement)).