11-4462-cv
Rates Technology v. Speakeasy

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: May 14, 2012      Decided: July 10, 2012)

Docket No. 11-4462-cv

RATES TECHNOLOGY INC.,

*Plaintiff-Appellant*,

— v. —

SPEAKEASY, INC., BEST BUY CO., INC., SPEAKEASY BROADBAND SERVICES, LLC,
MEGAPATH, INC., COVAD COMMUNICATIONS COMPANY, COVAD COMMUNICATIONS
GROUP, INC., CCGI HOLDING CORPORATION, PLATINUM EQUITY, LLC,

*Defendants-Appellees*.

B e f o r e:

MCLAUGHLIN, SACK, and LYNCH, *Circuit Judges*.

Plaintiff-appellant Rates Technology Inc. appeals from a judgment granting

defendants-appellees' motion to dismiss entered by the United States District Court for

the Southern District of New York (Denise Cote, *J.*) on May 10, 2011.  We hold that,

under the Supreme Court's decision in <u>Lear, Inc. v. Adkins</u>, 395 U.S. 653 (1969), a clause

in a settlement agreement that bars a patent licensee from later challenging the patent's

validity is void for public policy reasons if the settlement was entered into prior to the initiation of litigation between the parties. We accordingly AFFIRM the district court's judgment.

———————

DAVID LAZER (Zachary Murdock, *on the brief*), Lazer Aptheker Rosella & Yedid, P.C., Melville, NY, *for Plaintiff-Appellant*.

DAVID LEICHTMAN (Avani P. Bhatt, *on the brief*), Robins, Kaplan, Miller & Ciresi L.L.P., New York, NY, *for Defendants-Appellees Speakeasy, Inc. and Best Buy Co., Inc.*

David S. Elkins, Christopher D. Mays, Squire Sanders (US) LLP, Palo Alto, CA, *for Defendants-Appellees Megapath, Inc., Covad Communications Company, Covad Communications Group, Inc., CCGI Holding Corporation, Platinum Equity, LLC, and Speakeasy Broadband Services, LLC.*

———————

GERARD E. LYNCH, *Circuit Judge*:

This case requires us to consider whether a clause in a settlement agreement which bars a patent licensee from later challenging the patent's validity is void for public policy reasons under the Supreme Court's decision in Lear, Inc. v. Adkins, 395 U.S. 653 (1969), where the parties entered into the agreement after an accusation of infringement by the patent owner but prior to any litigation. We hold that, in these circumstances, such a no-challenge clause is void under Lear. We therefore affirm the decision of the United States District Court for the Southern District of New York (Denise Cote, *J.*) dismissing the complaint in this action.

2

# BACKGROUND

According to the First Amended Complaint ("Complaint"),[1] plaintiff-appellant Rates Technology Inc. ("RTI") is the owner of two patents (the "Patents") that cover inventions relating to the automatic routing of telephone calls based upon cost. RTI alleges that it is well known in the telecommunications industry "for its policy of settling patent infringement claims in accordance with a one-time payment tiered pricing structure based on the size of the accused infringer measured by its annual sales." In or around April 2007, RTI became aware that the Patents were being infringed by defendant-appellee Speakeasy, Inc. ("Speakeasy"), a telecommunications company that provided broadband, voice, and data services to businesses. RTI notified Speakeasy that it believed Speakeasy was infringing the Patents and, in accordance with company policy, offered to release Speakeasy from liability in exchange for a one-time payment consistent with RTI's tiered pricing structure.

On April 30, 2007, RTI and Speakeasy entered into an agreement, which was styled as a "Covenant Not to Sue" (hereinafter, the "Agreement"). The Agreement began with a series of recitals, which declared that (1) RTI is the holder of the Patents; (2) RTI

---

[1] The allegations set forth in this section are drawn from the Complaint and from a copy of the RTI-Speakeasy agreement attached to the Complaint. See ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (noting that "we may consider any written instrument attached to the complaint"). When reviewing a decision granting a motion to dismiss, we assume that all non-conclusory allegations made in a complaint are true, and construe them in the light most favorable to the plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678-80 (2009); Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 708, 715 (2d Cir. 2011).

3

"has alleged that products, services, and technology made, used, sold, offered for sale and imported by Speakeasy . . . infringe" the Patents; (3) "Speakeasy has denied any possible infringement"; and (4) "the parties desire to settle their potential differences on the terms and conditions set forth" in the Agreement. The Agreement then provided that RTI "release[d] and promise[d] not to sue Speakeasy" for any past or future infringement of the Patents. In exchange, Speakeasy agreed to make a one-time payment of $475,000 to RTI. The Agreement further provided that "Speakeasy acknowledges the validity, and enforceability of the Patents. Speakeasy does not admit that it has infringed the Patents."

The Agreement also included a provision barring Speakeasy from ever challenging, or assisting others in challenging, the validity of the Patents:

> Speakeasy hereby warrants and represents to RTI that on and after the execution date of this Covenant Speakeasy will not anywhere in the world challenge, or assist any other individual or entity to challenge, the validity of any of the claims of the Patents or their respective foreign counterpart patents or their respective foreign counterpart patent applications, except in defense to a Patent infringement lawsuit brought under the Patents against Speakeasy, its [products and services], and except as otherwise required by law.

This no-challenge clause was accompanied by the following liquidated damages provision:

> In the event that the above representation is incorrect then Speakeasy agrees that it shall pay to RTI as liquidated damages the additional amount of Twelve Million U.S. ($12 Million) Dollars plus all legal expenses necessary to collect this added amount.

4

The Agreement further defined "Speakeasy" to include both Speakeasy and defendant-appellee Best Buy Co., Inc., which had previously announced plans to acquire Speakeasy. Shortly after the Agreement between Speakeasy and RTI was signed, Best Buy's acquisition of Speakeasy closed.

Three years later, on June 10, 2010, Best Buy announced a plan to sell Speakeasy and merge it into entities associated with the various Covad defendants-appellees ("Covad Defendants").[2] The particular details of the merger, and of the byzantine corporate relationships among the Covad Defendants, are not relevant to this appeal. What is relevant is that around the time this transaction was announced, RTI once again learned of an infringement of the Patents. On June 25, 2010, RTI notified one of the Covad Defendants, Covad Company, that RTI believed it was infringing the Patents. RTI offered to release Covad Company from any liability for infringement in exchange for a one-time payment in an amount to be determined by RTI's tiered pricing structure. On July 23, 2010, Covad Company responded by filing a declaratory judgment action against RTI in the United States District Court for the Northern District of California (the "California Action") seeking a declaration that the Patents were invalid and unenforceable.

---

[2] The Covad Defendants are Platinum Equity, LLC, CCGI Holding Corporation, Covad Communications Group, Inc. ("Covad Group"), Covad Communications Company ("Covad Company"), and Speakeasy Broadband Services, LLC.

About a month later, on August 31, 2010, RTI initiated the present lawsuit. RTI's Complaint, as amended, alleges that during due diligence conducted in anticipation of the proposed merger, another of the Covad Defendants, Covad Group, learned of the Agreement between RTI and Speakeasy. It further alleges that Speakeasy and/or Best Buy "provided certain information relating to the RTI patents" to Covad Group, and that Covad Group or one of the other parties to the merger provided that same information to Covad Group's subsidiary, Covad Company. According to RTI, Covad Company used this information in formulating the allegations of the complaint in the California Action.

Accordingly, RTI's Complaint alleges that Speakeasy and Best Buy breached the Agreement's no-challenge clause – which included a prohibition on "assist[ing]" any challenge to the Patents' validity – by providing information relating to RTI's Patents that helped Covad Company challenge the validity of the Patents in the California Action. The Complaint also claims that all of the Covad Defendants are liable for the breach of contract by virtue of the merger. The Complaint seeks to hold all of the defendants jointly and severally liable, and to enforce the Agreement's $12 million liquidated damages clause.

A few months after the present lawsuit was filed, Covad Company voluntarily dismissed the California Action before RTI filed an answer. See Notice of Dismissal at 1, Covad Commc'ns Co. v. Rates Tech. Inc., No. 10-cv-3233 (N.D. Cal. Dec. 3, 2010), ECF

6

No. 15.[3]  Thereafter, the defendants in this case moved to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  On May 9, 2011, the district court granted the motions.  The court relied on the Supreme Court's decision in Lear, which held that the doctrine of licensee estoppel – under which a licensee of intellectual property "effectively recognizes the validity of that property and is estopped from contesting its validity in future disputes," Idaho Potato Comm'n v. M & M Produce Farm & Sales, 335 F.3d 130, 135 (2d Cir. 2003) – is "unenforceable in the context of challenges to the validity of patents," Rates Tech. Inc. v. Speakeasy, Inc., No. 10-cv-6482, 2011 WL 1758621, at *3 (S.D.N.Y. May 9, 2011) (citing Lear, 395 U.S. at 670-71).  The district court held that the no-challenge clause in this case, which was "entered into prior to the commencement of any litigation," was contrary to the "public interest in litigating the validity of patents" identified in Lear and its progeny.  Id.[4]  The court therefore held that the no-challenge clause was invalid, and that dismissal of the Complaint was required.

---

[3] We may "take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings."  Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation marks omitted).

[4] The district court did not reach the defendants' other arguments for dismissal, including Best Buy and Speakeasy's argument that RTI's claim that they "assisted" in filing the California Action did not satisfy the plausibility standard for pleading, see Iqbal, 556 U.S. at 678-80, and the Covad Defendants' argument that they were not bound by the Agreement. Because we affirm the district court's dismissal under Lear, we do not reach these arguments.

7

RTI appealed to the United States Court of Appeals for the Federal Circuit. Speakeasy moved to dismiss the appeal for lack of subject matter jurisdiction or to transfer the appeal to this Court. On September 8, 2011, the Federal Circuit determined that it lacked jurisdiction over this case because "the district court's jurisdiction did not arise in whole or in part under the laws governing [the Federal Circuit's] appellate jurisdiction" and because this "contract dispute does not require the resolution of a related question of patent law, such as inventorship, infringement, validity, or unenforceability." Rates Tech., Inc. v. Speakeasy, Inc., 437 F. App'x 940, 941 (Fed. Cir. 2011) (citing Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 599 F.3d 1277, 1283-84 (Fed. Cir. 2010)). Rather than dismiss the appeal, the Federal Circuit transferred it to this Court. Id.

**DISCUSSION**

RTI argues that the district court erred in applying the public policy rationale articulated in Lear favoring challenges to the validity of patents to invalidate the no-challenge clause in the Agreement. For support, RTI invokes a series of circuit court decisions which recognize that the strong public interest in settling ongoing litigation can justify the enforcement of no-challenge clauses that might otherwise be deemed invalid under Lear. As we explain below, those decisions do not render the no-challenge clause in this case enforceable, because the RTI-Speakeasy Agreement was entered into prior to any litigation between the parties.

8

**I. <u>Lear</u> and Its Progeny**

Our analysis must begin with <u>Lear</u>, a decision in which the Supreme Court repudiated the doctrine of licensee estoppel in patent law. As the Court noted, licensee estoppel was rooted in contract law, which generally "forbids a purchaser to repudiate his promises simply because he later becomes dissatisfied with the bargain he has made." 395 U.S. at 668. Federal patent law, by contrast, requires "that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." <u>Id</u>. Characterizing earlier judicial efforts to reconcile these "radically different concerns" as a "failure," the Court determined that the concerns of contract law were outweighed by those of patent law and therefore abandoned the doctrine of licensee estoppel. <u>Id</u>. at 668-71 (overruling <u>Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.</u>, 339 U.S. 827, 836 (1950)).

In justifying its holding, the Court explained that a typical patent licensor's "equities are far from compelling." <u>Id</u>. at 670. The grant of a patent "simply represents a legal conclusion reached by the Patent Office" – a conclusion reached in an ex parte proceeding and based upon factors "as to which reasonable men can differ widely." <u>Id</u>. Accordingly, the Court considered it not unfair "to require a patentee to defend the Patent Office's judgment when his licensee places the question in issue, especially since the licensor's case is buttressed by the presumption of validity which attaches to his patent." <u>Id</u>.; <u>see also</u> 35 U.S.C. § 282 ("A patent shall be presumed valid."). As the Court explained,

9

the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

Lear, 395 U.S. at 670-71.

In addition, the Court held that after the patent was granted the licensee in Lear could not be required to comply with the provision in its contract requiring it to pay royalties until the patent was actually held invalid, explaining that

[t]he parties' contract . . . is no more controlling on this issue than is the State's doctrine of estoppel, which is also rooted in contract principles. The decisive question is whether overriding federal policies would be significantly frustrated if licensees could be required to continue to pay royalties during the time they are challenging patent validity in the courts.

It seems to us that such a requirement would be inconsistent with the aims of federal patent policy. Enforcing this contractual provision would give the licensor an additional economic incentive to devise every conceivable dilatory tactic in an effort to postpone the day of final judicial reckoning. . . . Moreover, the cost of prosecuting slow-moving trial proceedings and defending an inevitable appeal might well deter many licensees from attempting to prove patent invalidity in the courts. . . . Lastly, enforcing this contractual provision would undermine the strong federal policy favoring the full and free use of ideas in the public domain.

Id. at 673-74.

10

As we have recognized, <u>Lear</u> is notable not only for its particular holdings regarding the doctrine of licensee estoppel and the enforcement of contracts for royalties, but also for establishing a "balancing test" for weighing the "public interest in discovering invalid patents" against other competing interests. <u>Idaho Potato Comm'n</u>, 335 F.3d at 135. In the decades since <u>Lear</u> was decided, lower federal courts have repeatedly been asked to balance the public interest in identifying invalid patents with federal policies favoring the resolution of disputes. In reviewing these decisions, we find it helpful to distinguish several methods by which patent disputes can be resolved.

First, a dispute over patent infringement and invalidity can be litigated to a final decision by a court. Such a decision ordinarily triggers the doctrine of res judicata, or claim preclusion, which "holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." <u>Monahan v. N.Y. City Dep't of Corr.</u>, 214 F.3d 275, 284 (2d Cir. 2000) (internal quotation marks omitted). Like the Federal Circuit, we "are aware of no court which has even suggested that <u>Lear</u> abrogates the application of *res judicata* principles based on a judgment imposed by the court after full litigation." <u>Foster v. Hallco Mfg. Co.</u>, 947 F.2d 469, 476 (Fed. Cir. 1991).

Second, disputes regarding patent infringement and validity can be – and often are – resolved through the entry of a consent decree following litigation between the parties. After some initial uncertainty, <u>see</u> <u>Kraly v. Nat'l Distillers & Chem. Corp.</u>, 502 F.2d 1366, 1369 (7th Cir. 1974), we and other courts applying <u>Lear</u> have recognized that such

11

decrees estop future challenges to a patent's validity, <u>see</u>, <u>e.g.</u>, <u>Wallace Clark & Co. v. Acheson Indus., Inc.</u>, 532 F.2d 846, 849 (2d Cir. 1976); <u>Foster</u>, 947 F.2d at 476-77; <u>Am. Equip. Corp. v. Wikomi Mfg. Co.</u>, 630 F.2d 544, 547-48 (7th Cir. 1980); <u>Schlegel Mfg. Co. v. USM Corp.</u>, 525 F.2d 775, 780-81 (6th Cir. 1975). As we explained in <u>Wallace Clark</u>,

> the interests of litigants and the public in general will be best served by according res judicata effect to consent decrees adjudicating a patent's infringement as well as its validity. While in some cases this policy may result in the survival of invalid patents, the agreements are arrived at in settlement of adversary litigation with infringement as well as validity determined and with the discovery machinery of the courts available to the parties, and are subject to court scrutiny, in contrast to the purely private license agreements on which pre-<u>Lear</u> estoppel was based.

532 F.2d at 849; <u>see</u> <u>also</u> <u>Foster</u>, 947 F.2d at 476 (distinguishing <u>Lear</u> on the ground that it "did not consider the policy concerns evoked when preserving the finality of a judgment").

Third, a patent dispute can be settled privately after the initiation of litigation, without the imprimatur of a consent decree. In <u>Warner-Jenkinson Co. v. Allied Chemical Corp.</u>, 567 F.2d 184 (2d Cir. 1977), we held that such a settlement did not estop a patent licensee from later challenging the validity of the patent in a later dispute over royalties. As we noted,

> [t]here is certainly a public interest in the avoidance of litigation through the peaceful resolution of lawsuits. In the patent field, however, this interest is to be balanced against the public interest in having invalid patents cleared away through

12

> litigation. If encouragement of such litigation is important enough to justify allowing licensees to sue to invalidate patents, then it makes little sense for us to strain to preserve the termination of such litigation through a settlement.

Id. at 188; see also Int'l Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 56-57 (2d Cir. 1979) (noting that enforcement of a settlement agreement providing for payment of damages for past infringement did not estop licensee "from challenging the validity of [the] patent when that claim is properly raised"). We suggested, however, that the result in Warner-Jenkinson might have been different if the agreement had contained a no-challenge clause. 567 F.2d at 188 ("[I]f a settlement agreement contains an explicit prohibition on licensee suits during some future period . . . a court may feel that effect should be given to such provisions.").[5]

Aside from our ambivalent dictum in Warner-Jenkinson, we have not addressed how Lear should apply to a settlement that resolves pending patent litigation and contains a no-challenge clause. However, the Federal Circuit has held that a no-challenge clause in such a settlement is valid under Lear. See Flex-Foot, Inc. v. CRP, Inc., 238 F.3d 1362, 1367-70 (Fed. Cir. 2001). In Flex-Foot, the Federal Circuit noted that the license in Lear "did not contain, and was not accompanied by, any promise by the licensee not to challenge the validity of the patent." Id. at 1368. As a result, Lear did not "implicate[]

---

[5] Cf. Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1374 (6th Cir. 1976) (holding that the rationale of the consent decree cases was "fully applicable" where a stipulated dismissal and settlement resolved pending patent litigation and there were other licensees and alleged infringers who had an incentive to challenge the patent's validity).

the important policy of enforcing settlement agreements and res judicata." Id.

Concluding that the policy interests underlying the "settlement of litigation [are] more strongly favored by the law" than the "technical requirements of contract doctrine" at issue in Lear, the Federal Circuit held that

> [o]nce an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent in suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding.

Id. at 1369-70; see also Hemstreet v. Spiegel, Inc., 851 F.2d 348, 350 (Fed. Cir. 1988) (holding that a party must pay royalties under a settlement license agreement even though the patent was held unenforceable in another court because "[t]he enforcement of settlement of litigation involves another public policy totally absent in Lear: the encouragement of settlement of litigation and the need to enforce such settlements in order to encourage the parties to enter into them").

Fourth, and finally, disputes about patent infringement and validity can be resolved by agreement prior to any litigation between the parties. The Ninth Circuit confronted a case involving such an agreement shortly after Lear was decided. See Massillon-Cleveland-Akron Sign Co. v. Golden State Adver. Co., 444 F.2d 425 (9th Cir. 1971) ("MCA"). In that case, MCA accused several parties, including Golden State Advertising Co. ("Golden State"), of infringing its patent, and threatened to take legal action against

them. Id. at 425. A lawsuit was averted when the parties entered into "a written agreement settling the controversy," under which Golden State "acknowledged the validity of the patent and covenanted to refrain from directly or indirectly contesting or questioning the validity of the patent." Id. Several years later, MCA sued Golden State, alleging that it had breached the settlement by again infringing the patent. Golden State asserted the patent's invalidity as a defense, and MCA argued that the settlement barred Golden State from challenging the patent's validity. Id. at 426. The Ninth Circuit held that the "'strong federal policy' referred to repeatedly in Lear" required it to hold that the covenant barring Golden State from contesting the validity of MCA's patent was "void on its face and unenforceable." Id. at 427. The Ninth Circuit found it "unimportant that . . . the covenant is part of a settlement agreement rather than of a typical patent licensing agreement," suggesting that if such a distinction were recognized it would be "easy to couch licensing arrangements in the form of settlement agreements." Id.

## II. Applying Lear to Pre-Litigation Settlement Agreements

As noted above, our task in this case is to balance the policy concerns of patent law articulated in Lear against countervailing policy concerns that favor requiring parties to adhere to the terms of agreements resolving their legal disputes. See Idaho Potato Comm'n, 335 F.3d at 137 ("Lear makes clear that courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest."). The situation in this case most resembles the one in the Ninth Circuit's MCA decision.

15

According to the Complaint, RTI became aware that Speakeasy was infringing the Patents in April 2007, and that same month the parties resolved their incipient dispute by entering into the Agreement. Neither side filed a lawsuit, and thus Speakeasy never had the opportunity to conduct discovery regarding the validity of RTI's patent. Like the settlement agreement in <u>MCA</u>, the Agreement between Speakeasy and RTI contains a provision in which Speakeasy promised not to contest the validity of the Patents – a provision that, Speakeasy and the other defendants now argue, is invalid under <u>Lear</u>.[6]

We find the Ninth Circuit's decision in <u>MCA</u> persuasive. As the present case demonstrates, it is common for patent licensing agreements to be entered into after a patent owner makes an initial accusation of infringement. In these circumstances, patent owners eager to avoid future challenges to their (possibly invalid) claims to a monopoly have a strong incentive to "couch licensing arrangements in the form of settlement agreements" by including recitals in their agreements declaring that the patent is valid. <u>MCA</u>, 444 F.2d at 427. If no-challenge clauses in pre-litigation agreements were held to be valid and enforceable, <u>Lear</u>'s strong policy "favoring the full and free use of ideas in the public domain" could be evaded through the simple expedient of clever draftsmanship. 395 U.S. at 674. The validity and scope of patents are often controversial, and any negotiation for a license agreement has the potential for the would-

---

[6] This case differs from <u>MCA</u> in that the RTI-Speakeasy Agreement contains a liquidated damages clause which provides that if Speakeasy affirmately challenges, or assists others in challenging, the validity of the Patents, it must pay $12 million in damages to RTI.

16

be licensee to raise questions about the patent's validity in order to secure a more favorable price. Creating a "good faith" dispute about patent validity that can be "settled" by a license including a covenant never to challenge the patent would rarely be an obstacle to parties seeking to evade the strictures of Lear. As a result, allowing such no-challenges whenever a license agreement is cast as a "settlement" could "close[] the doors of the courts to a large group of parties who ha[ve] sufficient interest in the patent to challenge its validity," Schlegel Mfg., 525 F.2d at 781, and thereby render Lear's prohibition of licensee estoppel – a prohibition that the Supreme Court held was required by strong public policy considerations – a dead letter.

Moreover, we note that prior to the initiation of litigation, the parties to a patent dispute will not have had an opportunity to conduct discovery that may shed light on the patent's validity. See Flex-Foot, 238 F.3d at 1370 (upholding a no-challenge clause where the parties settled after the alleged infringer "had an opportunity to conduct discovery on validity issues" and the parties had "fully briefed opposing summary judgment motions on the issue of invalidity"). The fact that parties have conducted discovery seems to us significant in two respects. First, it suggests that the alleged infringer has had a full opportunity to assess the validity of the patent, and is therefore making an informed decision to abandon her challenge to its validity. Second, the fact that parties have conducted discovery is evidence that they had a genuine dispute over the patent's validity, and that the patent owner is not seeking to prevent its monopoly from being challenged by characterizing ordinary licensing agreements as settlement agreements.

17

Thus, while we recognize the important policy interests favoring the settlement of litigation *may* support a different rule with respect to no-challenge clauses in settlements entered into after the initiation of litigation, see Warner-Jenkinson, 567 F.2d at 188; Flex-Foot, 238 F.3d at 1369-70,[7] and we are conscious of the great costs that can be associated with patent litigation, we believe that enforcing no-challenge clauses in pre-litigation settlements would significantly undermine the "public interest in discovering invalid patents," Idaho Potato Comm'n, 335 F.3d at 135. We therefore hold that covenants barring future challenges to a patent's validity entered into prior to litigation are unenforceable, regardless of whether the agreements containing such covenants are styled as settlement agreements or simply as license agreements.

We find RTI's various arguments urging us to find the no-challenge clause in the Agreement enforceable unpersuasive. First, it is true, as RTI observes, that we and other courts have recognized a strong judicial policy favoring the settlement of litigation, including patent litigation. See In re Tamoxifen Citrate Antitrust Litig., 466 F.3d 187, 202 (2d Cir. 2006) (noting "our longstanding adherence to the principle that courts are bound to encourage the settlement of litigation" (internal quotation marks omitted)); Foster, 947 F.2d at 477 ("[T]he Federal Circuit has repeatedly expressed the view that there is a strong public interest in settlement of patent litigation."); Asahi Glass Co. v. Pentech Pharms., Inc., 289 F. Supp. 2d 986, 991 (N.D. Ill. 2003) (Posner, J., sitting by

---

[7] As in Warner-Jenkinson, we have no need to decide here whether a no-challenge clause in a purely private post-litigation settlement, as distinct from a settlement that has been incorporated into a judicially-approved consent decree, may be enforced.

18

designation) ("The general policy of the law is to favor the settlement of litigation, and the policy extends to the settlement of patent infringement suits.").

As noted above, however, the present case involves a pre-litigation settlement. While such agreements are ordinarily enforceable, and indeed desirable, see McKenzie Constr., Inc. v. Maynard, 758 F.2d 97, 101-02 (3d Cir. 1985) (noting that "a prompt and efficient attorney who achieves a fair settlement without litigation serves both his client and the interests of justice"), we believe that in the patent context enforcing no-challenge clauses in pre-litigation settlements would too easily enable patent owners to "muzzle[]" licensees – the "only individuals with enough economic incentive to challenge" the patent's validity, Lear, 395 U.S. at 670. As the Ninth Circuit correctly noted in MCA, recognizing a distinction between pre-litigation settlements and ordinary licensing agreements "would, in practice, be less than workable." MCA, 444 F.2d at 427. Indeed, for the reasons stated above, this observation if anything understates the matter: license agreements with no-contest provisions could, and likely would, routinely be drafted as "settlements."

Second, RTI argues that the rule we adopt would "requir[e] parties who wish to settle a justiciable infringement dispute without litigation to go through the formality – perhaps even the charade – of filing an infringement action and actively 'litigating' . . . in order to make their settlement agreement enforceable." Appellant's Br. at 26-27. We disagree. Nothing in Lear or our ruling prevents parties in a patent infringement dispute from entering, prior to the initiation of litigation, nearly the entire agreement that RTI and Speakeasy signed in this case. That is, RTI and Speakeasy were free to resolve their

19

infringement dispute through an agreement in which Speakeasy paid RTI a lump-sum to cover past infringements and future uses. What RTI could not do, however, was covenant to forever shield itself from an invalidity action that Speakeasy might someday wish to bring, or assist others in bringing. Thus, our holding does not bar pre-litigation patent settlements, and patent owners need not go through the "charade" of litigating an infringement action in order to collect any royalties due to them. We doubt that parties would find it desirable to conduct expensive discovery in order to validate a no-challenge clause. To the extent that our rule may discourage the insertion of such clauses into licenses or settlement agreements, that is a desirable consequence for the reasons stated in Lear.

Third, RTI argues that we should follow dicta in a recent Federal Circuit decision suggesting that the existence of prior litigation and discovery between the parties is not required to render a no-challenge clause enforceable. See Baseload Energy, Inc. v. Roberts, 619 F.3d 1357 (Fed. Cir. 2010). In Baseload, which RTI never cited before the district court, the Federal Circuit held that a release provision in a settlement that resolved a breach of contract action did not bar a later challenge by one of the parties to the validity of a patent owned by the other party, because the release lacked "the clear and unambiguous language necessary to effect a release of patent invalidity defenses." Id. at 1364. However, the Federal Circuit also suggested that, if the release *had* contained such clear language, then the release would have barred any future patent invalidity claim despite the fact that the prior litigation involved only a contract dispute, not a dispute over patent infringement or validity. See id. at 1363 ("In the context of settlement agreements,

20

as with consent decrees, clear and unambiguous language barring the right to challenge patent validity in future infringement actions is sufficient, even if invalidity claims had not been previously at issue and had not been actually litigated.").

Because Baseload involved a release agreement entered into as part of a contract action that had nothing to do with patent infringement or validity, the Baseload court had no occasion to consider the concern, present in this case and in the Ninth Circuit's decision in MCA, that patent owners have an incentive to "couch licensing arrangements in the form of settlement agreements" in order to prevent licensees from later challenging the validity of their patent. MCA, 444 F.2d at 427. In any event, our court is not bound by the holdings – much less the dicta – of other federal courts of appeal.[8] We are, however, bound by the Supreme Court's decision in Lear. Accordingly, we decline RTI's invitation to extend the dicta in Baseload to render enforceable the no-challenge clause in this case.[9]

---

[8] The Federal Circuit's earlier decision in Flex-Foot, holding that no-challenge clauses are enforceable if they are entered into once an "an accused infringer has challenged patent validity, [and] has had an opportunity to conduct discovery on validity issues," 238 F.3d at 1370, seems to us to strike a more plausible balance between the policies of patent law articulated in Lear and policies favoring the resolution of disputes. As noted above in footnote 7, however, this case does not require us to decide whether to extend the rule of Wallace Clark to cover the situation in Flex-Foot.

[9] We note that for cases over which exclusive appellate jurisdiction lies in the Federal Circuit, see Lab Corp., 599 F.3d at 1284; 28 U.S.C. § 1295(a)(1), the Federal Circuit does not defer to the interpretations of Lear issued by other circuits because of the "need for uniformity and certainty" in patent law, Foster, 947 F.2d at 475. Accordingly, district courts in this circuit remain bound to follow the holdings of the Federal Circuit in cases falling within the appellate jurisdiction of the Federal Circuit. We also note, however, that our decision does not conflict with the holding of any decision of the Federal Circuit, despite being in some tension with dictum in Baseload. We anticipate that when the issue is squarely presented to it, the Federal Circuit will carefully consider whether that dictum is consistent with the Supreme Court's decision in Lear, which is binding on all the circuits.

21

Finally, RTI's attempt to distinguish <u>Lear</u> as a case involving "continuing royalty payments" is unconvincing. Appellant's Reply Br. at 8. First, as defendants note, RTI's case is premised on the notion that the Agreement imposed a continuing obligation upon Speakeasy not to assist others in asserting invalidity, and RTI fails to explain why that continuing obligation should be exempt from analysis under <u>Lear</u>. Moreover, as we recognized in <u>Idaho Potato Commission</u>, <u>Lear</u> not only ruled specifically on licensee estoppel and royalty payments, but also established a "balancing test" that has been applied in patent cases and in other areas of intellectual property law. 335 F.3d at 135 ("Courts applying the principles articulated in <u>Lear</u> to patent disputes have enforced no-challenge contract provisions only when the interests in doing so outweigh the public interest in discovering invalid patents."); <u>see also id</u>. at 136 (noting that "[t]he <u>Lear</u> balancing test has also been frequently applied to trademark licensing contracts"). Accordingly, we find it entirely appropriate to apply <u>Lear</u>'s balancing test to analyze the enforceability of the no-challenge clause in this case. Applying that test, we see no reason why the one-time payment of a flat fee by a licensee rather than an on-going obligation to pay royalties in exchange for a license would diminish the harm to the public from a ban on challenging potentially invalid patents, or would increase any countervailing interest favoring the no-challenge clause.

## CONCLUSION

We have considered all of Plaintiff-appellant's other arguments, and find them to be without merit. For the foregoing reasons, the judgment of the District Court is AFFIRMED.

22